ELSIE GHERE, Widow of Jim Ghere, Deceased, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Howell Asphalt, Appellee).

Fourth District   No. 4—95—0476WC

Argued January 11, 1996.—Opinion filed March 27, 1996.

Richard G. Leiser (argued), of Warren E. Danz, P.C., of Peoria, for appellant.

Robert N. Hendershot and David J. Reynolds, Jr. (argued), both of Evans & Dixon, of St. Louis, Missouri, for appellee.

JUSTICE COLWELL delivered the opinion of the court:

Claimant, Elsie Ghere, widow of Jim Ghere, appeals the trial court's confirmation of the Industrial Commission's (Commission) decision which affirmed and adopted the arbitrator's decision. The claimant argues on appeal that (1) the arbitrator erred in not allowing Dr. Climaco to testify at the arbitration hearing; (2) the arbitrator erred in not admitting into evidence a letter from the Illinois State Water Survey; and (3) the Commission's finding that claimant's deceased husband did not sustain an injury on August 22, 1990, which arose out of and in the course of his employment, is against the manifest weight of the evidence. We affirm.

Jim Ghere (decedent) collapsed at 10:30 a.m. on August 22, 1990, while working for appellee, Howell Asphalt. The decedent later died when emergency personnel were unable to revive him. The death certificate indicates that the decedent died as a result of a heart attack. The decedent was 63 years old when he died.

The decedent was working as a flagman for Howell Asphalt at the time he collapsed. He got to work at 6:30 a.m. on August 22, 1990. His job responsibility as a flagman on August 22, 1990, was to walk approximately 150 feet ahead of the paving machine to keep traffic out of the way. The decedent collapsed when Howell Asphalt was in the process of paving a highway.

Roger Carter testified on behalf of the appellant. He testified that he was working with the decedent on August 20, 21, and 22, 1990. He stated that the decedent worked 10 to 11 hours on August 20 and 21, 1990. Carter stated that it was very hot, humid and muggy on August 22, 1990, and that the decedent was sweating. He testified that the

temperature was 80 to 85 degrees at 6:30 a.m. on August 22, 1990. He testified that the heat of the asphalt adds 80 to 100 degrees to the air temperature. Carter stated that the decedent was at least 150 feet in front of the paver when he worked as a flagman on August 22, 1990. He testified that they had laid about 1¹/₂ to 2 miles of asphalt before the decedent collapsed. Carter testified that the decedent never complained to him about chest pains and he did not see the decedent being struck by any type of vehicle while he was flagging. Carter stated that he did not see the decedent take a break to get water or go to the bathroom between 7 a.m. and 10:30 a.m. on August 22, 1990.

Tim Murphy also testified on behalf of the claimant. Murphy worked with the decedent on August 22, 1990. He estimated the temperature on August 22, 1990, at 10:30 a.m. to be in the mid-eighties. He stated that the decedent was standing an average of 150 feet away from the paver. Murphy testified that the decedent did not complain to him about chest pains and that he did not see the decedent being struck by any type of vehicle while he was flagging on August 22, 1990. He testified that at 10:30 a.m. he told the decedent that he could get a drink of water and use the bathroom. He stated he observed the decedent get a drink of water and that the decedent collapsed when he returned to his position.

The claimant, the widow of the decedent, testified that the decedent had prostate surgery in April 1990. She stated that the decedent was off work for approximately three months and that he returned to work for the appellee on August 20, 1990. The appellant also stated that the decedent had no heart problems or complaints prior to August 1990.

Dr. Raymon Climaco testified on behalf of the appellant. Dr. Climaco's field of specialty is emergency room medicine. He testified that he treated the decedent on several occasions beginning in December 1979. The last time decedent saw Dr. Climaco was in the early part of 1990. Dr. Climaco testified that he never treated decedent for heart problems. The employer objected to Dr. Climaco giving any opinions regarding the cause of the decedent's death and regarding whether the decedent's work activities or the work environment was causally related to his death because his opinions on these matters were not furnished to the employer 48 hours before the arbitration hearing. The arbitrator sustained that objection.

The claimant presented the deposition testimony of Dr. Stuart Frank, a cardiologist. Dr. Frank testified that the decedent's medical records did not provide sufficient information for him to make a definite determination regarding the cause of the decedent's death and

causal connection between the decedent's death and the environmental circumstances surrounding his sudden death. Dr. Frank stated that the cause of decedent's death was most likely a myocardial infarction and/or a fatal ventricular arrhythmia. Dr. Frank explained that a myocardial infarction is, in lay terms, a heart attack, and a fatal ventricular arrhythmia refers to an irregular heartbeat where the heart is beating in such a way that it is not able to pump any blood out into circulation, which results in the patient's death.

Claimant's attorney asked Dr. Frank a series of hypothetical questions. The attorney asked Dr. Frank to assume that the decedent had returned to work as a flagman after prostate surgery; that he began work at 7 a.m.; that the temperature was 85 to 90 degrees; that traffic was heavy when he was flagging; and that he suffered a heart attack at 10:30 a.m. Appellant's attorney asked Dr. Frank if the decedent's heart attack could have been precipitated or accelerated by excessive amounts of gas or carbon monoxide at work, and Dr. Frank replied: "If he had been exposed to excessive amounts of gas or carbon monoxide, it's possible it could have or might have precipitated or accelerated the development of the fatal arrhythmia or a myocardial infarction."

Dr. Frank was also asked whether the employment environment, which was incorporated in the hypothetical question, could have aggravated or precipitated any preexisting or underlying heart condition wherein the decedent eventually developed the arrhythmia or myocardial infarction. Dr. Frank replied: "I cannot, with any medical confidence, address the question of the nature of his work and its relationship to his death. Of course, I'm not familiar with the activities of a flagman."

However, Dr. Frank later testified that the decedent's work activities could have or might have provoked a possible myocardial infarction or ventricular arrhythmia.

James Campbell testified for the employer. Campbell was the paving superintendent for Howell Asphalt on the day that the decedent collapsed. He testified that he assigned the decedent to the job of lead flagman on August 22, 1990. Campbell stated that 15 minutes prior to the time when the decedent collapsed, he asked the decedent if he needed relief for a drink of water or to go to the bathroom and the decedent indicated that he was fine. Campbell testified that when he asked the decedent if he wanted a break he made no complaints about his chest or arms and he looked absolutely normal. He stated that the decedent was not unusually sweaty or red-faced. Campbell testified that the air temperature was 70 to 75 degrees on August 22, 1990.

Campbell stated that the decedent was 150 to 200 feet in front of the paver when he was working as a flagman on August 22, 1990. Campbell was asked whether there is any difference between the temperature standing next to the paver as opposed to a flagman who would be standing 150 feet away from the paver, and Campbell replied:

"Yes, there would naturally be some heat difference. Like I said, the asphalt itself is 275 or 300 degrees coming out the back of the machine, so there's going to be some reflective heat from it, but when you're that far—when you're that far ahead, you're not going to feel anything from the asphalt."

Dr. Stephen Schuman, an internist and cardiologist, testified on behalf of the employer in an evidence deposition. Dr. Schuman testified that the decedent's death was caused by cardiac arrest precipitated by either primary ventriculation or a spontaneous blood clot formed in the natural history of coronary disease. Dr. Schuman indicated that in either case the decedent had suffered a ventricular fibrillation, which is a chaotic ventricle rhythm causing the heart to beat too rapidly. Dr. Schuman testified that the timing of the ventricular fibrillation was entirely coincidental. He also testified that coronary disease is very common in men over the age of 60. He indicated that it was not uncommon for there to be no warning that a heart attack will occur. Dr. Schuman testified that there was no connection between the decedent's work activities or the work environment and his death. Dr. Schuman stated that his opinion would not change even assuming the temperature on August 22, 1990, was in the mid- to upper-eighties.

The employer introduced into evidence a certified copy of the United States Department of Commerce records from the National Climatic Data Center. This showed that the maximum temperature in Mattoon, Illinois, on August 22, 1990, was 78 degrees and the minimum temperature was 67 degrees. The claimant attempted to introduce a letter from the Illinois State Water Survey as evidence of air temperature. The arbitrator, however, refused to admit the letter on hearsay grounds.

The arbitrator found that the claimant failed to prove that the decedent sustained an accidental injury on August 22, 1990, which arose out of and in the course of his employment. The Commission affirmed and adopted the arbitrator's decision. The circuit court of Douglas County confirmed the Commission's decision.

■ The claimant first contends that the arbitrator erred in not allowing Dr. Climaco to testify at the arbitration hearing concerning whether the decedent's work activities or the work environment

could or might have precipitated the decedent's heart attack. The arbitrator ruled that Dr. Climaco could not testify as to causal connection because his opinions on causation were not furnished to the appellee 48 hours before the arbitration hearing, pursuant to section 12 of the Illinois Workers' Compensation Act (Act) (820 ILCS 305/12 (West 1994)). The pertinent part of section 12 states:

> "In all cases where the examination is made by a surgeon engaged by the injured employee, and the employer has no surgeon present at such examination, it shall be the duty of the surgeon making the examination at the instance of the employee, to deliver to the employer, or his representative, a statement in writing of the condition and extent of the injury to the same extent that said surgeon reports to the employee and the same shall be an exact copy of that furnished to the employee, said copy to be furnished the employer, or his representative, as soon as practicable but not later than 48 hours before the time the case is set for hearing. Such delivery shall be made in person either to the employer, or his representative, or by registered mail to either, and the receipt of either shall be proof of such delivery. If such surgeon refuses to furnish the employer with such statement to the same extent as that furnished the employee, said surgeon shall not be permitted to testify at the hearing next following said examination." 820 ILCS 305/12 (West 1994).

The claimant contends that section 12 of the Act does not apply to treating physicians, but rather only applies to examining physicians. Therefore, claimant argues, because Dr. Climaco was the decedent's treating physician, section 12 of the Act is inapplicable. The supreme court in *Nollau Nurseries, Inc. v. Industrial Comm'n*, 32 Ill. 2d 190, 204 N.E.2d 745 (1965), refused to decide this issue. Our research has not found an appellate court decision that addresses this issue.

We believe the purpose of section 12 would be frustrated if we read section 12 to only apply to examining physicians. It seems to us from the language of section 12 that the purpose of having the employee's physician send a copy of his records to the employer no later than 48 hours prior to the arbitration hearing is to prevent the employee from springing surprise medical testimony on the employer. *Cf. Cook v. Optimum/Ideal Managers, Inc.*, 130 Ill. App. 3d 180, 188, 473 N.E.2d 334, 340 (1984). With this purpose in mind, we see no justification in limiting section 12 of the Act to examining doctors and we now so hold.

■ The claimant also argues that under *Nollau*, the arbitrator should have allowed Dr. Climaco's testimony. In *Nollau*, over the employer's objection, the arbitrator allowed the claimant's treating

physician to testify concerning the claimant's condition even though the physician's medical report was not furnished to the employer 48 hours before the hearing. The *Nollau* court held that the arbitrator did not err in allowing the treating physician to testify at the hearing. The court stated that the statute requires a refusal by the physician to furnish his records before his testimony is excluded. *Nollau*, 32 Ill. 2d at 193, 204 N.E.2d at 747. The court refused to render the physician's testimony inadmissible because there was nothing in the case to indicate that a request had been made for the physician's records.

The present case is distinguishable from *Nollau*. It appears from the record that the employer in the present case had Dr. Climaco's medical reports more than 48 hours before the arbitration hearing. However, the portion of Dr. Climaco's testimony to which the employer objected was Dr. Climaco's opinion regarding whether the decedent's work activities and the work environment could or might have precipitated the decedent's heart attack. Dr. Climaco's opinion on whether the decedent's work activities and the work environment could have precipitated the decedent's heart attack goes well beyond what is in his records. There is absolutely no mention in Dr. Climaco's records of his opinion regarding whether the decedent's activities or the work environment could have precipitated the decedent's heart attack. Dr. Climaco's records do not mention that he ever treated the decedent for a heart condition. There was nothing in Dr. Climaco's records to put the employer on notice that Dr. Climaco had an opinion regarding causal connection which the employer could have requested. Therefore, the arbitrator was correct in sustaining the employer's objection to Dr. Climaco's testimony regarding the above matters. See *Vera v. Industrial Comm'n*, 150 Ill. App. 3d 1033, 1036, 502 N.E.2d 337, 339 (1986).

■ The claimant also contends that the arbitrator erred in not admitting into evidence the letter from the Illinois State Water Survey. She argues that the letter falls within a hearsay exception. Our research of the case law on this issue does not support the claimant's argument. The court in *Chicago & Northwestern Ry. Co. v. Trayes*, 17 Ill. App. 136, 139-40 (1885), held that a certified copy of a weather report is admissible if it was prepared by an individual who had a duty to record truly the facts contained therein. In the present case, the letter from the Illinois State Water Survey was not certified and, therefore, it does not fall under the hearsay exception set out in *Trayes*.

■ The claimant's final contention on appeal is that the Commission's finding that the decedent did not sustain an accidental injury

on August 22, 1990, which arose out of and in the course of his employment, is against the manifest weight of the evidence. The claimant has the burden of proving by a preponderance of the credible evidence all the elements of his claim, including that the injury arose out of and in the course of his employment. *Parro v. Industrial Comm'n*, 260 Ill. App. 3d 551, 553, 630 N.E.2d 860, 862 (1993), *aff'd*, 167 Ill. 2d 385, 657 N.E.2d 882 (1995). The determination of whether an injury arose out of and in the course of the claimant's employment is generally a question of fact for the Commission, and the Commission's determination thereof will not be set aside unless it is contrary to the manifest weight of the evidence. *Hansel & Gretel Day Care Center v. Industrial Comm'n*, 215 Ill. App. 3d 284, 292-93, 574 N.E.2d 1244, 1250 (1991). In resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Kirkwood v. Industrial Comm'n*, 84 Ill. 2d 14, 20, 416 N.E.2d 1078, 1080 (1981). It is only when the decision of the Commission is against the manifest weight of the evidence that the decision of the Commission should be set aside. *Dexheimer v. Industrial Comm'n*, 202 Ill. App. 3d 437, 442-43, 559 N.E.2d 1034, 1037 (1990). The Commission's decision is against the manifest weight of the evidence only where an opposite conclusion is clearly evident. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894, 896 (1992). The test is not whether this or any other tribunal might reach the opposite conclusion, but whether there was sufficient factual evidence in the record to support the Commission's decision. *Boatman v. Industrial Comm'n*, 256 Ill. App. 3d 1070, 1072, 628 N.E.2d 829, 830-31 (1993).

The claimant argues that the decedent's work activities and the work environment precipitated the decedent's heart attack. There was conflicting medical testimony on this issue. The claimant points to Dr. Frank's testimony to support her argument. Dr. Frank testified that the decedent's work activities could or might have provoked the decedent's death. However, Dr. Schuman testified that there was no connection between the decedent's work activities or the work environment and his death. Dr. Schuman further stated that his opinion would not change even assuming the temperature on August 22, 1990, was in the mid- to upper-eighties. Determining which of two medical witnesses is more worthy of belief and whose evidence is entitled to the greater weight is the function of the Commission. *Olin Industries, Inc. v. Industrial Comm'n*, 394 Ill. 593, 69 N.E.2d 305 (1946).

The other evidence that the claimant presented to support her

argument was the testimony of Carter and Murphy. They both testified that the temperature was 80 to 85 degrees on August 22, 1990. However, Campbell testified that the temperature was 70 to 75. Further, according to the National Climatic Data Center, the temperature in Mattoon on August 22, 1990, never got above 78 degrees and the low temperature was 67 degrees.

The claimant also argues that the decedent was exposed to severe heat because of the heat coming from the asphalt. Carter testified that the heat of the asphalt adds 80 to 100 degrees to the air temperature. However, Campbell testified that the decedent was 150 to 200 feet in front of the paver when he was working as a flagman on August 22, 1990, and that at that distance the decedent would not be able to feel the added heat from the pavement. It is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Kirkwood*, 84 Ill. 2d at 20, 416 N.E.2d at 1080. Viewing the record as a whole, there was sufficient factual evidence to support the Commission's decision. Therefore, the Commission's determination that the decedent's death on August 22, 1990, did not arise out of and in the course of his employment is not against the manifest weight of the evidence.

For the foregoing reasons, we affirm the decision of the circuit court of Douglas County.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, HOLDRIDGE, and RARICK, JJ., concur.