WILLIAM MULLIGAN, Appellant, v. ILLINOIS WORKERS'
COMPENSATION COMMISSION *et al.*, (Rand McNally, Appellee).

First District (Workers' Compensation Commission Division)
No. 1—09—2507WC

Opinion filed March 28, 2011.—Rehearing denied April 27, 2011.

Thomas R. Lichten, of Thomas R. Lichten, Ltd., of Chicago, for appellant.

Christopher P. Carr, of Garofalo, Schrieber, Hart & Storm, Chtrd., of Chicago, for appellee.

JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice McCullough and Justices Hudson and Hoffman concurred in the judgment and opinion.
Justice Holdridge specially concurred, with opinion.

## OPINION

The central issue in this appeal concerns the requirement in section 12 of the Illinois Workers' Compensation Act (820 ILCS 305/12 (West 2008)) (the Act) that the proponent of medical testimony furnish a report of the medical expert to the other party at least "48 hours before the time the case is set for hearing." This appeal is brought by

the claimant, William Mulligan, from an order of the circuit court which confirmed a decision of the Illinois Workers' Compensation Commission (the Commission), awarding the claimant 12 weeks of temporary total disability (TTD) benefits and permanent partial disability (PPD) benefits to the extent of 50% of the person as a whole as a result of a work-related accident. On appeal, the claimant argues, among other issues, that the Commission improperly admitted the medical testimony of two witnesses over his objection in violation of section 12 of the Act. We agree with the claimant and reverse the judgment of the circuit court, vacate the decision of the Commission, and remand the matter to the Commission for further proceedings.

## BACKGROUND

The claimant, who worked as the vice president of sales and marketing for the employer, Rand McNally, suffered two work-related accidents, one in February 1994, and one in May 1994. On March 21, 1995, the claimant filed a separate application for adjustment of claim for each of these 1994 accidents. The arbitrator conducted a consolidated hearing on the claimant's claims on three different days, spanning a period of over two years: April 20, 2004, July 27, 2005, and July 31, 2006. At the arbitration hearing, it was undisputed that the claimant suffered from significant degenerative conditions in his neck and right knee prior to the 1994 accidents at issue. The parties disputed whether the claimant's accidents aggravated his preexisting neck and knee conditions.

The claimant had a number of surgical procedures on his right knee prior to the 1994 work accidents, including a total right knee replacement in January 1988. In March 1991, the claimant had surgery on his neck which included a "cervical hemilaminectomy at C4/5 and C5/6" and a "foraminotomy at C4/5 and C5/6." The claimant testified that after his knee replacement in January 1988, his knee was pain free and he was "able to do just about anything." In June 1993, however, the claimant experienced sudden pain and swelling in his right knee. The claimant saw Dr. Sonnenberg, and he found "a 2+ effusion of the right knee" and that the claimant had tenderness "over the base of the patellar tendon where it inserts into the anterior tibial tubercle." Dr. Sonnenberg noted in his June 18, 1993, report that the claimant did a lot of golfing and swimming and that he encouraged "swimming over golfing until the effusion goes down." Dr. Sonnenberg stated in his report that an X-ray of the claimant's right knee did not reveal any loosening and that the knee looked "very good."

The first work-related accident involved in this appeal occurred on February 23, 1994. On that day, the claimant was headed to the employer's Nashville, Tennessee, facility with a coworker, and they were walking in the parking lot of the Chicago Midway Airport to catch their flight. There was approximately 8 inches of snow on the ground that day. As the claimant walked through the parking lot, carrying his overnight bag and briefcase, his feet slipped on the snow and he fell. He testified that his right knee got caught under his body, twisted, and hyperflexed. He testified that he also struck his neck during the fall, but the only pain at the time was in his knee. He could not walk, but his coworker helped him into the terminal, where they got a wheelchair to get him to his flight. The next day he had to get another wheelchair in Nashville, and on the third day after the accident, he was able to walk with a limp.

The claimant testified that his right knee hurt and was swollen for a week. The claimant's neck hurt after the accident, but not to the extent of his knee. A week or two after the accident, however, his neck started hurting more than his knee. The claimant did not miss any work as a result of the February 1994 fall. Although he testified that he was treated by a chiropractor, he did not produce any medical records for treatment following that accident.

The second accident occurred on May 31, 1994. In describing the second accident, the claimant testified that it occurred when he was coming down the stairs in front of the employer's headquarters as a coworker briefed him on a possible acquisition of a company in California. The claimant was heading to the airport for a flight to Los Angeles, California, and was running late. The stairs in front of the employer's headquarters were "shiny marble," and the claimant slipped and fell backward on the stairs because they were "slippery." The fall rendered the claimant unconscious for 10 to 15 minutes. He testified that he again hyperflexed his right knee during the fall. Paramedics transported the claimant to the emergency room at St. Francis Hospital. He missed his flight to Los Angeles and did not complete the business trip.

The emergency room records show that the claimant reported that he hit the right side of his neck and his right knee. X-rays of the right knee at the emergency room revealed the prior total knee replacement, but did not reveal anything wrong with the prosthetic. X-rays of the claimant's cervical spine revealed anterior osteophytes formation at C5, C6, and C7, and degenerative changes at the C5 and C6 discs.

At the arbitration hearing, the claimant presented evidence that his neck conditions worsened shortly after the May 1994 accident. He sought treatment by a chiropractor in June 1994, hoping that adjust-

ments to his neck and shoulders would relieve the pain he experienced in his neck and head, which had increased after the May 1994 accident. By December 1994, the claimant continued to have an acceleration of headaches, neck pain that radiated into his right shoulder, and persistent numbness of his right thumb, index finger, and middle finger.

In April 1995, the claimant saw a neurologist, Dr. Jerva. According to Dr. Jerva's records, after the 1994 accidents the claimant suffered from numbness and tingling in his right arm and from "cervical radiculopathy and occipital headaches." Dr. Jerva wrote in his April 5, 1995 report: "Symptoms began increasing in December, 1994, and continued to accelerate until such time as it has become unbearable and intractable." The claimant's pain in the "occipital region and upper cervical region [was] severe with radiation into the right shoulder." Dr. Jerva concluded that the claimant's neck condition was "clearly" cervical degenerative osteoarthritis "with a C6 radiculopathy and an associated cerebral concussion with loss of consciousness for ten minutes or more."

Dr. Jerva's records from 1996 state that the claimant had "persistent tingling and numbness in the C5 and C6 distribution" and that the claimant complained mainly of headaches and numbness in his right thumb, index, and middle finger. In addition, the records state that the claimant had a "[r]adicular component extending up the right extremity to the middle arm" and had "[e]xquisite tenderness overlying the right greater occipital nerve."

After the May 31, 1994, accident, the claimant did not seek any medical attention with respect to his right knee until he saw Dr. Sonnenberg in June 1996. Dr. Sonnenberg wrote in his notes dated June 26, 1996, that the claimant had been doing well with his knee replacement, except for occasional swelling, but he was concerned about possible wear of the claimant's knee prosthesis.

The claimant saw Dr. Reinhart in August 1996 concerning his right knee pain and swelling. Dr. Reinhart noted that the claimant had effusion and tenderness in his knee area and that X-rays "demonstrated what appear[ed] to be metal on metal contact" in the knee prosthesis. The X-rays of the prosthesis showed "[s]ignificant medial tilting of the tibial tray." Dr. Reinhart suspected that the claimant's knee problems "related to wear from his original prosthesis." He did not know whether the conditions were a recent occurrence or had been "a chronic or progressive condition since no previous x-rays were available." Dr. Reinhart recommended a "[r]ight total knee revision."

Later in 1996, the claimant saw Dr. Sweeney, who suspected a possible infection in the knee joint. Cultures from around the knee,

however, returned negative, which indicated that there was no infection. On February 25, 1997, Dr. Sweeney replaced the claimant's entire knee prosthetic. After the surgery, the claimant had to wear a knee brace to hold the new knee prosthetic in place while he walked. The brace reached the top of his right thigh and extended underneath his foot. He also walked with the assistance of a cane. He could walk only 100 to 150 yards at a time before the muscles and tendons in his knee got hot and sore, and he had to rest.

With respect to the claimant's neck pain, on October 8, 1998, Dr. Cerullo and Dr. Geisler performed a "C3 through C7 laminectomy." The claimant testified that, after the surgery, the back of his neck would become tight during the day which caused headaches. On a normal day, he could last two or three hours before he had to put his head down. When his neck got tight, he had to lay his head down for 45 minutes to an hour, and then he would feel better for another hour or two. In addition, he testified that if he could not lie down and take the weight off his neck, he had to take five to eight hydrocodone pills throughout the day. He did not take any hydrocodone pills on the days he could lie down frequently and take the weight off his neck. In March 2006, he started wearing a morphine patch that emitted pain medicine into his bloodstream. Pain injections in the claimant's shoulder and neck were successful for only a week or two.

The claimant testified that he had to hold his cane in his left hand because he suffered from carpal tunnel syndrome in his right arm. At times, he suffered numbness or pain from his right shoulder down to his hand. He could not grasp anything forcefully with his right hand because of pain. At times, he could not open and close his right hand. The claimant testified that, at the time of the arbitration hearing, he spent his days watching television, reading the newspaper, and talking on the telephone. He laid down every two or three hours. He testified that he could not do anything around the house, such as mowing the lawn or gardening, because of pain in his neck and shoulders. On an ordinary day, he did not have much pain in his right knee because he did not walk much. If he tried to walk anywhere, however, his knee would start to hurt after walking approximately 100 yards. He testified that the pain in his neck was getting worse. The claimant also testified that at times, both hands felt paralyzed and he was unable to completely close his hands.

On the issues of causation and the nature and extent of his disability, the claimant presented the evidence deposition testimony of Dr. Gates. Dr. Gates testified that he examined the claimant in 2003, and also reviewed his medical records. Dr. Gates found that the claimant's 1997 right knee revision was unstable. He observed that

the claimant had to use a cane, wear a brace, and walk with a painful and unstable gait. Dr. Gates could see that the lower leg shifted sideways when the claimant walked because his ligaments were stretched out, damaged, and not functioning properly. The claimant still had fluid or swelling in his right knee and had moderate to significant tenderness over the knee. Because of the knee instability, Dr. Gates did not believe that the claimant could perform any type of employment that involved walking. Dr. Gates felt that there was a causal connection between the claimant's two 1994 accidents and the claimant's knee and neck conditions. With respect to the knee injury, he testified that both accidents were "classical for causing loosening of the prosthesis." In his report dated July 11, 2003, Dr. Gates wrote that the two accidents that occurred in 1994 were "responsible for the subsequent surgeries and revision in 1997."

The claimant also presented the evidence deposition testimony of Dr. Chmell. Dr. Chmell is an orthopedic surgeon who examined the claimant and reviewed his medical records in January 2004. Dr. Chmell testified that the claimant's right knee suffered from "gross instability *** in all planes." The right knee also "demonstrated crepitus, clicking, and popping" as it was "ranged."

Dr. Chmell's diagnosis of the claimant included "traumatic loosening" of the claimant's right knee prosthesis, "traumatic aggravation" of the degenerative condition of the claimant's cervical spine, aggravation of degenerative disc disease of his lumbar spine, aggravation of osteoarthritis in the claimant's left knee, aggravation of bilateral carpal tunnel syndrome, and aggravation of bilateral cubital tunnel syndrome. The claimant suffered from "double pinch syndrome," which was a nerve that was pinched at the claimant's wrists and also at the base of his neck. Dr. Chmell believed that these conditions were related to both of the accidents the claimant had on February 23, 1994, and on May 31, 1994. Dr. Chmell stated in his report that the claimant sustained injuries to his right knee and cervical spine as a result of the 1994 accidents and that the injuries resulted in multiple surgeries to the right knee and surgery to the cervical spine. He further stated that the claimant's knee injury hampered the claimant's ability to stand and walk, causing aggravation of underlying low back and left knee conditions.

Dr. Chmell testified that the claimant was fully and permanently disabled as a result of his conditions. According to Dr. Chmell, the condition of the claimant's right knee precludes him from doing any meaningful walking or standing for job purposes. In addition, Dr. Chmell believed that the claimant was limited in his ability to work from a sitting position because of the condition of his upper extremi-

ties. Specifically, the condition of the claimant's cervical spine and upper extremities caused him pain, limited motion, limited strength, and limited sensation in his upper extremities. Dr. Chmell opined that the claimant could not "meaningfully use his upper extremities for a job." The claimant's lower back also precluded the claimant from sitting for prolonged periods, and his use of hydrocodone for his pain interfered with his ability to think and concentrate. Dr. Chmell concluded that all of the claimant's conditions together prevented the claimant from being "in a workable position to accomplish anything on a regular daily basis."

The employer presented the live testimony of Dr. Kornblatt and the evidence deposition testimony of Dr. Hopkinson on the issue of whether the 1994 accidents caused the claimant's right knee conditions. The claimant objected to the testimony of these doctors, arguing that the employer had not timely furnished him copies of the doctors' medical reports as required by section 12 of the Act (820 ILCS 305/12 (West 2008)).

As noted above, the arbitrator conducted a consolidated hearing on the claimant's claims on April 20, 2004, July 27, 2005, and July 31, 2006. The claimant testified at the beginning of the hearing on April 20, 2004. The hearing did not conclude on April 20, 2004, and the proofs remained open at the conclusion of the proceedings that day. The parties appeared before the arbitrator on August 17, 2004, on the employer's motion for a *dedimus potestatem* to take the evidence deposition of its independent medical examiner, Dr. Hopkinson. Counsel for the employer noted that the motion was brought pursuant to Commission Rule 7030.60. Dr. Hopkinson had examined the claimant in February 1999, but for reasons not stated in the record, the employer had not taken an evidence deposition of Dr. Hopkinson prior to the start of the hearing on April 20, 2004.

In his objection to the employer's motion for a *dedimus potestatem*, the claimant's attorney stated that he had never received Dr. Hopkinson's report until he received a letter from the employer's counsel dated July 15, 2004. The letter included a copy of Dr. Hopkinson's report and a statement that the employer would be relying on the report at trial. The claimant's attorney objected to the late request for an evidence deposition on the basis that section 12 of the Act required the report to be provided to the claimant no later than 48 hours before the commencement of the hearing on April 20, 2004. Because the employer had not furnished the doctor's report until July 2004, the claimant argued that the doctor's testimony should be excluded under section 12. Counsel for the employer stated his belief that a copy of the report had been sent to the claimant's attorney at the time the

report was created, but offered no proof of that claim. He offered no explanation for failing to schedule the deposition before the arbitration hearing. Instead, he argued that the claimant would "suffer no prejudicial effect" if he was allowed to proceed with the deposition.

The arbitrator overruled the claimant's objection to the employer's request for an evidence deposition of Dr. Hopkinson. In doing so, the arbitrator simply noted that "the examination of the doctor has not started" and that the parties "have not completed the hearing." No finding was made that the employer had shown good cause for taking the deposition after the arbitration hearing had commenced. The parties subsequently took Dr. Hopkinson's evidence deposition on November 4, 2004.

In addition to obtaining Dr. Hopkinson's evidence deposition after the start of the hearing on April 20, 2004, the employer also retained a new medical expert, Dr. Kornblatt, to conduct a review of the claimant's medical records and render opinions concerning the claimant's knee conditions. On September 24, 2004, Dr. Kornblatt prepared a report that set out his findings and opinions based on his document review, and that report was then furnished to the claimant.

When the parties appeared at the arbitration hearing on July 27, 2005, the employer called Dr. Kornblatt as a witness. The claimant objected to his testimony, arguing that section 12 required that the employer furnish him a copy of Dr. Kornblatt's report at least 48 hours prior to the start of the April 20, 2004, hearing. The claimant's attorney argued that section 12 bars the testimony of a new examining physician retained by the employer after the arbitration hearing has commenced, the claimant has testified, and the depositions of the claimant's physician witnesses have been taken. The arbitrator overruled the claimant's objection and again ruled that the 48-hour requirement in section 12 applied to the day of the hearing on which the doctor testified, not to the first day of the hearing on April 20, 2004. The arbitrator, therefore, allowed Dr. Kornblatt to testify on July 27, 2005, over the claimant's objection.

Dr. Kornblatt testified that he never examined the claimant, but he was requested to perform a review of the claimant's medical records and offer opinions concerning the claimant's conditions based on the records. Dr. Kornblatt testified that, in his opinion, the claimant "had an ongoing early failure of his right total knee replacement, beginning with his problem in 1993." To a reasonable degree of medical and surgical certainty, he believed that the claimant's "prosthesis would have failed whether or not the claimant had actually sustained [the 1994 accidents]." He testified: "I think it is certainly possible that those injuries may have aggravated the underlying failure that was in

place, but I don't think that the end result would have been any different had he not sustained the injury." In addition, Dr. Kornblatt testified that, "[b]ased on the time between the injury and [the claimant] seeking further medical care," it was likely that the 1994 accidents aggravated the claimant's knee condition only temporarily.

Dr. Kornblatt agreed that the type of falls that the claimant sustained could loosen or cause damage to the claimant's prosthesis. However, Dr. Kornblatt noted that in 1993, Dr. Sonnenberg found a 2+ effusion. Dr. Kornblatt explained that "[a] knee that's five years out doing well does not have an effusion in the absence of injury, and there was no injury" in 1993. Dr. Kornblatt also testified that he believed that if a fall had caused the polyethylene in the claimant's prosthesis to loosen, he would have expected the polyethylene to have cracked, and he did not think that the claimant could have gone on with his normal activities for several months before seeing a physician for further care.

Dr. Kornblatt testified: "I believe that this is just the ongoing microscopic wear that has happened historically with this type of prosthesis." He believed that the prosthesis was failing before the claimant's accidents and that the accidents caused only a temporary aggravation. He testified that if the accidents increased the speed of the wear of the prosthesis, they did so only minimally.

The parties appeared before the arbitrator again on July 31, 2006, to complete the proofs on the claimant's claims. At that hearing, the employer offered the November 4, 2004, evidence deposition of Dr. Hopkinson. The claimant renewed his section 12 objection, and the arbitrator admitted Dr. Hopkinson's deposition over the claimant's objection.

Dr. Hopkinson testified at the evidence deposition that he performed an independent medical examination of the claimant's right knee on February 2, 1999. The claimant complained at that time of constant knee pain and complained that rest and narcotic medications did not seem to alleviate the pain. Dr. Hopkinson noted that the claimant wore a long leg brace and walked with a cane.

Dr. Hopkinson testified that he believed that the second knee replacement that was conducted in February 1997 was required because of "progressive osteolysis from rapid failure of [the claimant's] original right knee replacement surgery." He testified that "at the present time" knee prosthesis components were expected to last 10 to 15 years of normal use, but prostheses used during the time when the claimant received his first knee replacement "have polyethylene inserts that are not of the same quality and durability as the ones that are now." Dr. Hopkinson also felt that the claimant "would be

extremely limited in his work-related capacity due to the constant soft tissue pain in his knee and that he would have extreme limitations and could not work or stand more than 20 minutes or lift greater than 20 pounds." Dr. Hopkinson felt that the claimant's knee conditions "would be permanent and that he would be limited at best to a sedentary lifestyle or sedentary activities." Dr. Hopkinson explained that, from a surgeon's perspective, there was nothing more that could be done with the claimant's knee conditions except pain modalities and therapy with bracing.

With respect to the claimant's 1994 accidents, he testified that they were the kind of accidents that could have caused or led to a premature failure of the claimant's knee prosthesis, but it was hard for him to say that conclusively. He did not think the accidents were the sole cause of the failure of the claimant's prosthesis because the claimant "also had the process of osteolysis," but he stated that the accidents could have been a contributing factor. Dr. Hopkinson offered no opinion about the claimant's spine.

At the conclusion of the consolidated arbitration hearing, the arbitrator rendered separate decisions for each of the 1994 accidents. The arbitrator found that the claimant injured his right knee, neck, and back when he fell on February 23, 1994, at the airport. The arbitrator, however, concluded as follows: "Based upon the testimony and the evidence submitted, the [claimant] failed to prove that he sustained an accident on February 23, 1994, arising out of and in the course of his employment with the [employer] and that his current condition of ill-being is causally connected to an injury on February 23, 1994." The arbitrator further found that "the incident on February 23, 1994, is superceded by the incident and resulting injuries on May 31, 1994."

The Commission affirmed and adopted the arbitrator's decision with respect to the February 23, 1994, accident except that the Commission clarified the arbitrator's decision as follows: "The Arbitrator's finding of no causal connection and denial of benefits was based upon [the claimant's] failure to prove that this accident is related to [the claimant's] current condition of ill-being." The Commission stated that it "affirms and adopts the finding that, while [the claimant] did sustain accidental injuries arising out of and in the course of employment, [the claimant] did not seek any medical care after the accident, did not miss any time from work, and any current condition of ill-being is causally related to [the claimant's] second accident on May 31, 1994."

With respect to the May 31, 1994, accident, the arbitrator found that the accident arose out of and in the course of his employment and

that the condition of the claimant's neck was causally related to the work accident. The arbitrator stated: "Although the [claimant] reported having cervical problems prior to May 31, 1994, when he sought chiropractic care on June 9, 1994, subsequent to his accident, he reported more numbness in his right arm and fingers and increase in the frequency of reoccurrence of neck pain and headaches." The arbitrator found, however, that the claimant "failed to prove that his right knee, back, carpal tunnel and cubital tunnel are related to the work injury." The arbitrator found as follows:

"The [claimant] reported falling and striking the back of his neck and a trauma to his right knee at St. Francis Hospital on May 31, 1994. When he sought chiropractic care on the 9th of June, he reported that both feet went up and his neck hit the stairs. The [claimant] did not report that he hyperflexed or twisted his right leg or describe a fall that would have been consistent with a hyperflexion of his right leg. He did not seek any medical care for his knee until June 26, 1996, at which time Dr. Sonnenberg suspected problems with the polyethylene tray and wear debris. The opinion of Dr. Gates [is] not consistent with the evidence and is conjecture."

The arbitrator found that the injuries that the claimant sustained caused permanent partial disability to the extent of 35% loss of use of the person as a whole. The arbitrator awarded temporary total disability (TTD) benefits for the 12 weeks after the claimant's cervical surgery on October 8, 1998. Although the arbitrator found that necessary medical services had not been provided by the employer, he found that the claimant's medical expenses for his cervical spine could not "be determined from the evidence submitted." The claimant had submitted a lengthy exhibit which included bills for the combined treatment of the claimant's multiple injuries. The arbitrator ordered that the employer receive credit for any amount paid for the medical bills and ordered the employer to hold the claimant harmless for all medical bills paid by its group health insurance carrier.

The Commission, however, modified the arbitrator's decision concerning the May 31, 1994, accident. The Commission agreed with the arbitrator's findings that the claimant's neck conditions were causally connected to the accident and that the claimant's knee conditions were not causally related. The Commission further found, however, that the claimant's medical expenses and treatment for carpal tunnel syndrome and cubital tunnel syndrome were causally connected to the accident on May 31, 1994. The Commission stated as follows:

"As early as June 2, 1994, [the claimant] was complaining of numbness/tingling in the right arm and hand and those complaints

continued. Eventually, [the claimant] began treating for his carpal tunnel symptoms and the October 2003 EMG indicated right-sided carpal tunnel syndrome. Ultimately, as [claimant] testified, it was determined that he did not have carpal tunnel syndrome and, rather, that his arm numbness/tingling, etc, was due to his cervical condition. As such, we find that [the claimant's] treatment for carpal and cubital tunnel syndrome were reasonable attempts to determine if the symptoms were being caused by something other than the neck."

However, the Commission implicitly affirmed the arbitrator's finding that the medical expenses could not "be determined from the evidence."

The Commission further modified the arbitrator's decision by finding that the claimant suffered the loss of 50% of the person as a whole as a result of his permanent partial disability. The claimant appealed the Commission's decisions with respect to both accidents, and in a consolidated proceeding for review, the circuit court confirmed the decisions of the Commission. This appeal followed.

## ANALYSIS

The claimant raises several issues on appeal, including that the Commission's admission of the testimony of Dr. Kornblatt and Dr. Hopkinson violated section 12 of the Act (820 ILCS 305/12 (West 2008)). The claimant further argues that, without their testimony, the Commission's finding that his right knee condition was not causally connected to the 1994 work accidents and the Commission's decision to deny benefits for permanent total disability (PTD) as a result of the 1994 accidents were against the manifest weight of the evidence.

Section 12 of the Act requires the claimant to submit to a medical examination by a qualified medical practitioner or surgeon selected by the employer for purposes of determining the nature, extent, and probable duration of the injury received by the claimant. 820 ILCS 305/12 (West 2008). Section 12 further provides as follows:

"In all cases where the examination is made by a surgeon engaged by the employer, and the injured employee has no surgeon present at such examination, it shall be the duty of the surgeon making the examination at the instance of the employer to deliver to the injured employee, or his representative, a statement in writing of the condition and extent of the injury to the same extent that said surgeon reports to the employer and the same shall be an exact copy of that furnished to the employer, said copy to be furnished the employee, or his representative as soon as practicable but not later than 48 hours *before the time the case is set for hearing.* *** If such surgeon refuses to furnish the employee with such

statement to the same extent as that furnished the employer said surgeon shall not be permitted to testify at the hearing next following said examination." (Emphasis added.) 820 ILCS 305/12 (West 2008).

Our analysis of the claimant's objection to the testimony of Dr. Kornblatt and Dr. Hopkinson requires us to construe this language of section 12 of the Act. When resolution of an issue on appeal involves a question of statutory construction, the proper standard of review is *de novo*. *City of Chicago v. Workers' Compensation Comm'n*, 387 Ill. App. 3d 276, 278, 899 N.E.2d 1247, 1248 (2008). The primary goal of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 473, 837 N.E.2d 1, 11 (2005).

With respect to Dr. Kornblatt's testimony, the first issue we must address is whether his testimony, based on a review of medical documents rather than an examination of the claimant, falls within the purview of section 12. In doing so, we note that section 12, on its face, applies to "physical examinations." *Ghere v. Industrial Comm'n*, 278 Ill. App. 3d 840, 663 N.E.2d 1046 (1996), offers us guidance in interpreting the scope of the requirements of section 12.

In *Ghere*, an employer objected to the testimony of a treating physician because his opinions were not furnished to the employer 48 hours before the arbitration hearing pursuant to section 12 of the Act, and the arbitrator sustained that objection. *Ghere*, 278 Ill. App. 3d at 842, 663 N.E.2d at 1048. On appeal, the claimant contended that section 12 of the Act applies only to examining physicians, not treating physicians. *Ghere*, 278 Ill. App. 3d at 845, 663 N.E.2d at 1050. The *Ghere* court disagreed and held that section 12 applies to treating physicians. *Ghere*, 278 Ill. App. 3d at 845, 663 N.E.2d at 1050. The court reasoned that "the purpose of section 12 would be frustrated if we read section 12 to only apply to examining physicians." *Ghere*, 278 Ill. App. 3d at 845, 663 N.E.2d at 1050. The language of section 12 evidences that its purpose is to prevent a party from springing surprise medical testimony on the other party at the arbitration hearing. *Ghere*, 278 Ill. App. 3d at 845, 663 N.E.2d at 1050. This purpose is served by having the proponent of medical testimony send a copy of the physician's records to the other party "no later than 48 hours prior to the arbitration hearing." *Ghere*, 278 Ill. App. 3d at 845, 663 N.E.2d at 1050. The *Ghere* court concluded: "With this purpose in mind, we see no justification in limiting section 12 of the Act to examining doctors and we now so hold." *Ghere*, 278 Ill. App. 3d at 845, 663 N.E.2d at 1050.

We apply this same reasoning in the present case with respect to Dr. Kornblatt's testimony. Dr. Kornblatt formed his opinions, not by

examining the claimant, but by examining his medical records. The purpose of section 12 would be frustrated if parties were allowed to spring surprise medical testimony at the arbitration hearing from doctors who form their opinions exclusively through a review of medical records without conducting an examination of the injured employee. Accordingly, we hold that the testimony of a physician that is based upon a review of medical records rather than a physical examination falls within the 48-hour disclosure requirements of section 12.

Having determined that Dr. Kornblatt's testimony falls under the requirements of section 12 of the Act, we must next determine whether the employer complied with the section 12 requirement that the claimant be sent a copy of the doctor's report no later than 48 hours "before the time the case is set for hearing" (820 ILCS 305/12 (West 2008)). This step in our analysis requires us to determine when the case is "set for hearing" for purposes of measuring the 48-hour disclosure requirement. In *City of Chicago*, we construed this phrase under different circumstances, but our analysis in that case is relevant to construing the statute under the procedural history of the present case.

In *City of Chicago*, prior to the matter being heard by the arbitrator, the parties took the deposition of the claimant's treating physician in May 2004. *City of Chicago*, 387 Ill. App. 3d at 277-78, 899 N.E.2d at 1248. The employer subsequently furnished the claimant a report of an independent medical examiner in September 2004. *City of Chicago*, 387 Ill. App. 3d at 277-78, 899 N.E.2d at 1248. The matter was heard before the arbitrator in February 2005 and May 2005. *City of Chicago*, 387 Ill. App. 3d at 277-78, 899 N.E.2d at 1248. During the arbitration hearing, an issue arose concerning the admissibility of evidence from the employer's independent medical examiner under section 12. *City of Chicago*, 387 Ill. App. 3d at 277-78, 899 N.E.2d at 1248. The arbitrator concluded that the hearing began when the parties took the deposition of the treating physician in May 2004. *City of Chicago*, 387 Ill. App. 3d at 278, 899 N.E.2d at 1248. Therefore, the arbitrator excluded evidence from the employer's independent medical examiner based on a determination that the report had not been produced prior to the commencement of the hearing. *City of Chicago*, 387 Ill. App. 3d at 278, 899 N.E.2d at 1248.

On appeal, the *City of Chicago* court held that the testimony was improperly excluded. *City of Chicago*, 387 Ill. App. 3d at 280, 899 N.E.2d at 1250. The court held that the term "hearing" in section 12 referred to the arbitration hearing, not the treating physician's deposition. *City of Chicago*, 387 Ill. App. 3d at 280, 899 N.E.2d at 1250. In his concurring opinion, Justice Gordon noted that the term "hearing"

is generally defined as being synonymous with the term "trial." *City of Chicago*, 387 Ill. App. 3d at 281-82, 899 N.E.2d at 1251 (Gordon, J., specially concurring) (citing *Donovan v. Industrial Comm'n*, 125 Ill. App. 3d 445, 449, 465 N.E.2d 1071, 1074 (1984)). "Therefore, given its plain and ordinary meaning, a hearing begins when the parties start to present their arguments and evidence to the arbitrator, not with the taking of an evidence deposition." *City of Chicago*, 387 Ill. App. 3d at 281-82, 899 N.E.2d at 1251 (Gordon, J., specially concurring).

We now give the term "hearing" its plain and ordinary meaning and hold that compliance with section 12 of the Act dictates that the proponent of medical testimony provide the other party with the required medical reports 48 hours before evidence is presented on the first day of the arbitration hearing. This holding is consistent with the purpose of section 12, which is to prevent one party from springing surprise medical testimony on the other party. While circumstances may occur where strict compliance with the requirements of section 12 would result in substantial prejudice, and a showing of good cause would justify relaxing those requirements, this is not such a case. As occurred in this case, one party should not be allowed to retain a new examining physician, over objection, after the arbitration hearing has commenced and the other party has testified and obtained the depositions of his physician witnesses. We note, however, that nothing in the Act would prevent the parties from stipulating to the admission of medical testimony that would not otherwise meet the requirements of section 12. We further note that our holding should discourage the unfortunate practice of continuing an arbitration hearing for the presentation of evidence on multiple days over a period of months or, as in this case, a period of years.

In the present case, the parties began presenting evidence to the arbitrator on April 20, 2004. Although the proofs were not completed that day, April 20, 2004, was the day that "the case was set for hearing" under the requirements of section 12. Therefore, both parties' physicians were required to furnish their reports to the opposing party at least 48 hours prior to the commencement of the hearing on April 20, 2004. Since Dr. Kornblatt was not even retained to perform a records review until after the arbitration hearing had commenced, his report could not have been timely submitted. His report was not submitted until September 2004, several months after the time the case was set for hearing. Accordingly, pursuant to section 12 of the Act, the Commission should not have allowed Dr. Kornblatt to testify and should have sustained the claimant's objection to his testimony.

Likewise, the Commission improperly allowed the admission of the evidence deposition of Dr. Hopkinson over the claimant's section 12

objection. As noted above, after the arbitration hearing commenced on April 20, 2004, the parties appeared before the arbitrator in August 2004 on the employer's motion for a *dedimus potestatem* to take the evidence deposition of Dr. Hopkinson. Dr. Hopkinson examined the claimant and prepared a report in February 1999. The claimant objected to Dr. Hopkinson's testimony, arguing that he did not receive Dr. Hopkinson's report until July 2004, well beyond the time the case was set for hearing. The employer's attorney stated: "It was our understanding that a report of Dr. Hopkinson was generated and transmitted contemporaneous to the production of the report [to the claimant's attorney's] office. A few weeks back I had sent a copy of the report with some deposition dates or an indication to [the claimant's attorney] that we wanted to secure the deposition of Dr. Hopkinson, and then [the claimant's attorney] had refused to agree to the deposition of Dr. Hopkinson." The claimant's attorney denied that he had ever received Dr. Hopkinson's report prior to July 2004, and the employer offered no proof that the report had been submitted to the claimant on any earlier date. The arbitrator granted the employer's motion for a *dedimus potestatem* over the claimant's objection, and the parties took the evidence deposition of Dr. Hopkinson on November 4, 2004, which was admitted into evidence over the claimant's objection.

We conclude that Dr. Hopkinson's testimony was improperly admitted. We hold that when a party objects to the admission of medical testimony on section 12 grounds, the proponent of the medical testimony has the burden to prove compliance with the requirements of section 12 of the Act. In the present case, the employer's attorney stated that it was his "understanding" that Dr. Hopkinson's report was furnished to the claimant contemporaneously with its production. The only proof, however, that the report was sent to the claimant was a transmittal letter sent in July 2004, indicating that the employer intended to rely on Dr. Hopkinson's report. The transmittal of the report in July 2004 was untimely under section 12 of the Act. Accordingly, Dr. Hopkinson's testimony should have been excluded.

In addition, Dr. Hopkinson's testimony should have been excluded because the employer failed to show "good cause" for taking his evidence deposition after the start of the arbitration hearing. Section 7030.60 of the rules adopted by the Commission governs the timing of evidence depositions in workers' compensation proceedings. 50 Ill. Adm. Code 7030 (2008). Section 7030.60 provides that "[e]vidence depositions of any witness may be taken after the hearing begins *only upon order of the Arbitrator or Commissioner, for good cause shown.*" (Emphasis added.) 50 Ill. Adm. Code 7030.60(a). In the present case,

the employer's counsel stated that the motion for a *dedimus potestatem* was brought pursuant to section 7030.60.

However, our review of the record does not reveal any showing of good cause to allow Dr. Hopkinson's late evidence deposition after the hearing had begun. As we have already held, the arbitration hearing in this case began on April 20, 2004. By allowing Dr. Hopkinson's deposition without requiring the employer to show good cause, the arbitrator violated section 7030.60, and the Commission erred in adopting the arbitrator's ruling on that issue. Since there was no showing of good cause, section 7030.60 mandated that the claimant's request for a late deposition be denied.

Further, we cannot find that the admission of Dr. Kornblatt's and Dr. Hopkinson's testimony was harmless error. When erroneously admitted evidence does not prejudice the objecting party, error in its admission is harmless. *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1013, 832 N.E.2d 331, 342 (2005). In the present case, the parties disputed the issue of whether the claimant's work-related accidents contributed to the claimant's conditions of ill-being in his right knee. In addition, the parties disputed the extent of the claimant's disability as a result of the work-related injuries.

The arbitrator and the Commission found that the claimant's knee conditions were not causally connected to the work accidents, and neither the arbitrator nor the Commission expressly relied on the employer's medical testimony. However, our review of the record reveals that the only medical opinion admitted at the hearing that supported the Commission's finding was the testimony of Dr. Kornblatt. In fact, the employer's attorney conceded at oral argument that Dr. Kornblatt's testimony was the only medical testimony in the record that supported a finding that the claimant's knee conditions were not causally connected to the 1994 accidents. The claimant presented medical testimony of two examining physicians who opined that the 1994 accidents aggravated his knee conditions and were causally connected to the conditions of ill-being in his right knee. Accordingly, we cannot uphold the Commission's decision. We must remand this matter to the Commission for new findings that do not rely on the testimony of Dr. Hopkinson or Dr. Kornblatt.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County confirming the decision of the Commission is reversed. We vacate the decision of the Commission and remand the cause to

the Commission for further proceedings consistent with the holdings contained herein.

Reversed; Commission decision vacated; cause remanded.

JUSTICE HOLDRIDGE, specially concurring:

I concur. I write separately to note my concurrence only with the majority's holding that the Commission's admission of testimony by Drs. Kornblatt and Hopkinson violated section 12 of the Act. 820 ILCS 305/12 (West 2008). When a party objects to the admission of medical testimony on section 12 grounds, the proponent of the medical testimony has the burden to prove compliance with the requirements of section 12 of the Act. The judgment of the court in the instant matter is that the employer failed to meet the specific requirement of section 12 which requires that a report of a physician who will give testimony at the arbitration hearing must be provided to the opposing party at least 48 hours prior to the commencement of the arbitration hearing. Here the record supported the finding that the reports of Drs. Kornblatt and Hopkinson were not provided to the claimant before the hearing commenced on April 20, 2004.

Having found that the proposed medical testimony was barred under section 12 of the Act, there is no need for this court to address the "good cause" provision found in Section 7030.60 of the Commission rules. 50 Ill. Adm. Code 7030.60(a). Section 7030.60 is a general evidentiary provision which provides that "[e]vidence depositions of *any* witness may be taken after the hearing begins *only upon order of the Arbitrator or Commissioner, for good cause shown.*" (Emphasis added.) 50 Ill. Adm. Code 7030.60(a). This provision applies to an evidence deposition of any party, and does not specifically address medical testimony. Medical testimony is specifically addressed by section 12 of the Act.

I would find that section 7030.60 clearly has no application to the instant matter. The "good cause" provision of section 7030.60 cannot allow an arbitrator or the Commission to excuse noncompliance with section 12 of the Act. See *Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board*, 274 Ill. App. 3d 145, 148 (1995) (an agency rule or regulation which conflicts with a statute is invalid). Simply put, if a party does not comply with section 12 of the Act by providing the physician's written report at least 48 hours prior to hearing, that physician cannot testify, either in person or by evidence deposition. Neither the arbitrator nor the Commission can excuse noncompliance with section 12 of the Act for "good cause." While section 7030.60 of the Commission rules might allow the arbitra-

tor or the Commission to permit the taking of an evidence deposition of an occurrence witness after the hearing has commenced, it cannot allow the taking of an evidence deposition from a physician where the proffering party has failed to provide a report from that physician to the other party prior to the commencement of the hearing. To allow the taking of that physician's deposition after the hearing had commenced, even for "good cause" shown, would violate section 12 of the Act.

I would hold that where, as here, a party has failed to comply with section 12 of the Act, the medical testimony is barred. The Commission may not excuse noncompliance with the Act for "good cause" pursuant to section 7030.60 of Commission rules. I, therefore, disagree with the portion of the judgment of the court discussing compliance with section 7030.60 of the Commission rules.