2019 IL App (5th) 180528WC-U

Workers' Compensation
Commission Division
Order Filed: November 6, 2019

No. 5-18-0528WC

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| KERRY HOOTEN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | St. Clair County |
| | ) | |
| v. | ) | No. 18 MR 36 |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.*, | ) | Honorable |
| | ) | Julie K. Katz, |
| (Empire Comfort Systems, Appellee). | ) | Judge, Presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hudson, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held:* We affirm the circuit court's judgment confirming the Workers' Compensation Commission's decision finding that the claimant failed to prove (1) that he sustained an accidental injury arising out of and in the course of his employment or (2) that his current condition of ill-being is causally connected to a work accident and denying the claimant benefits under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2012)).

¶ 2    The claimant, Kerry Hooten, appeals from a judgment of the circuit court of St. Clair County which confirmed the decision of the Illinois Workers' Compensation Commission (Commission), finding that he failed to prove that he sustained an accidental injury arising out of and in the course of his employment with Empire Comfort Systems (Empire); that his current condition of ill-being is causally connected to a work accident; and denying him benefits under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2012)). For the reasons which follow, we affirm the judgment of the circuit court.

¶ 3    The following factual recitation is taken from the evidence adduced at the arbitration hearing held on March 30, 2017.

¶ 4    The claimant has a medical history that is relevant to this appeal, involving two prior workers' compensation claims he filed against Empire while he was employed as a leadman. On December 2, 2009, the claimant incurred a repetitive trauma to his cervical spine (case number 10 WC 010995). On January 5, 2011, the claimant received an anterior cervical discectomy, interbody fusion at C5-C6 and C6-C7, performed by Dr. Nicholas Poulos. On May 19, 2011, the claimant was released to return to work without restrictions; however, he was not completely pain-free in his neck.

¶ 5    On December 7, 2011, the claimant incurred a repetitive trauma to his left shoulder (case number 12 WC 06821). On April 17, 2012, the claimant received a left shoulder arthroscopic shaving of a type I "SLAP" tear at the superior glenoid labrum, performed by Dr. Dennis Dusek. The claimant's left shoulder pain improved, and according to a letter from Dr. Dusek dated May 25, 2012, the claimant was 80-90% pain-free. On May 29, 2012, the claimant returned to full duty work without restrictions. The claimant entered into settlement agreements with Empire on the cervical spine and left shoulder claims in July 2012 and December 2012, respectively. The

settlement agreements provided that the claimant waived his rights to the following: trial before an arbitrator; appeal of the arbitrator's decision before the Commission; any further medical treatment at Empire's expense "for the results of this injury;" and any additional benefits if his condition worsens "as a result of this injury."

¶ 6    The claimant testified that he could not recall if he was pain-free after the 2012 left shoulder surgery; however, when he returned to full duty work, for about six months, he felt "very decent" physically. He began experiencing pain while performing his duties as a leadman, particularly when working continuously on the air drop machine.

¶ 7    The claimant testified that Empire manufactures fireplaces and heaters and that he has been employed with Empire as a leadman for approximately 25 years. The claimant explained that his job as a leadman is both supervisory and "hands-on." He participates in the manufacturing process, ensures proper productivity on the assembly line, and helps other workers "keep up" with the manufacturing process to prevent production slow-down. According to the claimant, in October of 2014, after working on the air drop machine, he began experiencing neck and shoulder pain and informed his safety director, Ronald Musenbrock, of his symptoms. The claimant testified that he experienced pain in his neck and left shoulder from 2012 to 2014, but that his pain level increased from what it was in 2012, such that he now experiences pain in both his left and right shoulders. According to the claimant, when Dr. Dusek released him to work full duty in 2012, he did not have any problems with his right shoulder.

¶ 8    The claimant testified that he completed air drop work on a continuous basis each day. The air drop job required the claimant to attach four-inch tubes to 3 1/2 to 4 foot long air drop components, using both hands to operate the tube swedger machine. The claimant operated the

swedger machine at shoulder height and experienced shoulder and neck pain because of the force required to hold the swedger machine down into place to allow the tubes to enter the air drop.

¶ 9     According to the claimant, there were times where he performed overhead work on the paint line. He would raise units over his head and hang them on the chains for paint application. Although hanging units on the paint line was not his normal job, the claimant could perform this job on a daily basis if an employee was behind, needed help, or took a restroom break. The claimant testified that performing work on the paint line hurt his shoulders because he was reaching overhead.

¶ 10     According to the claimant, he also worked on the brake press machine to "fill-in" for other employees. The brake press operates by inserting a flat piece of metal into the machine, engaging the foot pedal, and bending the metal upward to the accurate angle. The claimant testified that when operating the brake press, he was working above shoulder height and that it aggravated his pain when he was twisting and turning the metal in the machine.

¶ 11     Musenbrock testified on behalf of Empire that the claimant had come to see him in October 2014 and reported that he was still experiencing shoulder and neck pain. However, he maintained that the claimant did not request to complete an accident report, nor did he recall the claimant saying that his neck and shoulder complaints were work-related. According to Musenbrock, the claimant had not complained of problems with his neck or shoulders between 2012 (when the claimant settled his prior workers' compensation claims) and October 1, 2014. He estimated that the claimant would perform work at or above shoulder level for 20% of the day, and that it could be more than 20% depending on the units that were made. Musenbrock testified that 100% of the paint line job involves performing work at shoulder level or above.

Musenbrock also explained that the heaviest units on the paint line may weigh up to 100 pounds, but that an employee would only manually lift units that weighed up to eight pounds.

¶ 12    On August 18, 2015, the claimant sought treatment from Dr. Dusek, complaining of bilateral shoulder pain. According to Dr. Dusek's notes, the claimant experienced persistent soreness in his left shoulder after his 2012 arthroscopic surgery, with increased pain after returning to full duty work, such that, in October 2014, the pain was now also in his right shoulder. Dr. Dusek noted that the claimant performs repetitive overhead work, especially when hanging units on an overhead line for paint application and that his pain was aggravated by reaching overhead. Dr. Dusek noted that the claimant's pain was located anterolaterally and was aggravated by shoulder motion almost exactly where the C5 dermatome would overlap. Dr. Dusek also noted that the tingling in the claimant's index finger and the adjacent two fingers was "somewhat concerning for a C4-[C]5 disc disease." That same day, Dr. Dusek ordered x-rays of both of the claimant's shoulders, which were found to be normal. Dr. Dusek also ordered an x-ray of the claimant's cervical spine, which was performed on August 19, 2015, and confirmed advanced degenerative changes at C4-C5 with disc height loss and endplate spurring. Dr. Dusek determined that the claimant had shoulder bursitis, prescribed Meloxicam, and asked him to return in one month for a follow-up visit.

¶ 13    On October 29, 2015, the claimant returned to Dr. Dusek, who ordered a CT scan and MRI of the claimant's cervical spine and recommended that the claimant see Dr. O'Boynick, a board-eligible orthopedic spine surgeon, because he believed that the claimant's current symptoms stemmed from his neck (cervical spine), rather than his shoulders. The MRI of the claimant's cervical spine was performed on November 6, 2015, and revealed a left-sided disc herniation at C3-C4, possibly affecting the C4 root, and degenerative changes at C4-C5. The CT

scan of the claimant's cervical spine was also performed on November 6, 2015, and revealed a degenerated disc at C4-C5 with a 3 millimeter pseudoretrolisthesis of C4 against C5, a completely fused C5-C6 disc level with hardware in good position, and an incomplete fusion of C6-C7 with lucencies surrounding the lower screws in the body of C7, possibly indicating loose screws.

¶ 14　The claimant saw Dr. O'Boynick on November 13, 2015, complaining of bilateral hand and finger tingling and numbness as well as stabbing pain in both shoulders. Dr. O'Boynick testified by evidence deposition that he reviewed the claimant's November 6, 2015 MRI of his cervical spine, and found that it revealed a left-sided disc herniation at C3-C4 and degenerative changes at C4-C5, just above the claimant's 2011 fusion at C5-C6 and C6-C7, which he maintained could be causing some pressure on the C5 nerve root. According to Dr. O'Boynick, the November 6, 2015 CT scan of the claimant's cervical spine revealed consolidation and fusion across the C5-C6 level, a pseudoarthrosis at C6-C7, as well as juxtafusional breakdown at C4-C5, which could have some effect on his nerve roots. Dr. O'Boynick determined that based on the claimant's complaints, he may have carpal tunnel syndrome and referred him to Dr. Ashok Kumar for an EMG of his bilateral upper extremities.

¶ 15　On November 19, 2015, the EMG was performed and revealed that the claimant had bilateral carpal tunnel syndrome with no denervation of the muscles supplied by C5 to T2. Dr. O'Boynick administered trial injections into the bilateral carpal tunnels, recommended that the claimant wear a brace at night on his left wrist, and recommended six weeks of physical therapy.

¶ 16　On December 28, 2015, the claimant returned to Dr. O'Boynick, informing him that the carpal tunnel injections provided minimal relief and that the brace only offered minor improvements to the numbness in his hand. He continued to complain of bilateral shoulder pain

around the deltoids and exhibited weakness in the rotator cuff muscles on examination. Dr. O'Boynick believed that the claimant's pseudoarthrosis at C6-C7 was asymptomatic, but that the juxtafusional breakdown above this construct could be resulting in a C5 radiculopathy that was causing bilateral shoulder pain and some weakness from the pain, "but not necessarily *** true muscular weakness" in the rotator cuff. Dr. O'Boynick referred the claimant to Dr. Randall Otto for evaluation of his continued bilateral shoulder pain.

¶ 17    On January 12, 2016, the claimant was seen by Dr. Otto, who determined that the claimant's shoulders and his neck were contributing to his pain. Dr. Otto recommended physical therapy three times per week for six weeks. Dr. Otto also recommended intraarticular injections into the glenohumeral joints of both shoulders. On January 22, 2016, Dr. Kumar performed the bilateral shoulder intraarticular injections.

¶ 18    On February 9, 2016, the claimant returned to Dr. Otto, reporting minimal relief from the injections. On examination, Dr. Otto noted that the claimant experienced pain with impingement maneuvers and recommended bilateral nerve root injections at C5 to alleviate the pain in his neck and shoulders.

¶ 19    On February 19, 2016, and March 4, 2016, Dr. Richard Gahn, a pain management specialist, administered cervical epidural steroid injections at C4-C5, but they did little to help with the claimant's neck and shoulder pain. Dr. Gahn noted that the claimant's pain was concentrated on the left side and, therefore, recommended a left C5 nerve root block. On March 18, 2016, the claimant received the C5 nerve root block and experienced immediate pain relief.

¶ 20    On March 25, 2016, the claimant returned to Dr. O'Boynick, who noted that the claimant still had pain in his shoulders, but that the left C5 nerve root block provided 50-60% improvement in his pain, proving that C4-C5 was symptomatic. Based on the successful results

of the left C5 nerve root block, Dr. O'Boynick recommended a C4 to C7 anterior cervical discectomy and fusion revision with extension up to C4-C5, noting that he would take down and attempt to re-graft the nonunion area at C6-C7 with new bone. Dr. O'Boynick also recommended that the claimant be examined by an ear, nose, and throat specialist (ENT) to determine whether both of his vocal cords were working before determining a surgical approach.

¶ 21    On April 29, 2016, the ENT evaluated the claimant's vocal cords by fiberoptic laryngoscopy and identified paralysis of his right vocal cord. On May 18, 2016, the claimant returned again to Dr. O'Boynick, who noted that the claimant continued to experience bilateral shoulder pain and mild left-sided neck pain. Dr. O'Boynick believed that the claimant's bilateral shoulder pain was related to his juxtafusional breakdown and foraminal stenosis at C4-C5. Dr. O'Boynick discussed possible surgical options with the claimant, including "a stand-alone device at C4-[C]5 to address his continuing shoulder pains versus a complete revision of his construct with take down of the [previous hardware] as well as the nonunion at C6-[C]7 and revision fusion at C6-[C]7 in addition to anterior cervical discectomy and fusion at C4-[C]5." Dr. O'Boynick testified that the C5-C6 level has a solid fusion; therefore, he would insert a plate across it, but would do nothing surgically to that level.

¶ 22    On May 25, 2016, Dr. O'Boynick reviewed the May 18, 2016 x-rays of the claimant's cervical spine which revealed instrumented fusion from C5 to C7 with a nonunion at C6-C7, intact screws at C5 and C6, and "a lot of spondylosis" at C4-C5 with spurring along the posterior margin of the body and uncovertebral joint hypertrophy at C4-C5. Dr. O'Boynick testified that he had reviewed previous medical records in "2010 or 2011" from after the claimant's earlier anterior cervical discectomy, interbody fusion at C5-C6 and C6-C7, and that the claimant has sustained advancement of his spondylotic segment and foraminal stenosis at the C4-C5 level. Dr.

O'Boynick opined that his bilateral shoulder pain symptoms were primarily coming from the C4-C5 level and that the nonunion or psuedoarthrosis at C6-C7 would typically cause generalized discomfort in the neck, but would not cause his shoulder pain. He further opined that when the claimant performed work at shoulder height and above, he would have to look overhead, turn his head in all directions, thereby constantly engaging all of the segments in the cervical spine, increasing pressure across cross segments that are right next to the fused segment. Dr. O'Boynick noted that the claimant's neck movements could also cause pain and aggravate his pseudoarthrosis at C6-C7. Dr. O'Boynick testified that the pathology at C4-C5, which was proven symptomatic, could also cause the claimant's neck pain. Dr. O'Boynick recommended that the claimant undergo an anterior cervical discectomy and fusion at C4-C5, removal of the hardware at C6-C7, and anterior replacement.

¶ 23    Dr. O'Boynick opined that the claimant had sustained an aggravation in his cervical spine as a result of performing his work-related duties. He explained that the claimant has a spondylotic cervical segment that creates foraminal stenosis and that, when he is performing work above shoulder height, looking up and placing things above shoulder height, he would be flexing and extending his neck, closing down the foraminal space behind the disc and constantly pinching his C5 nerve root, causing pain in his shoulders. With the recommended anterior cervical discectomy and fusion at C4-C5, removal of the hardware at C6-C7 and anterior replacement, Dr. O'Boynick anticipates a reduction in the pain in the claimant's shoulders and barring any issue with healing, that he would be able to return to full work duty without restrictions in three months.

¶ 24    Dr. O'Boynick opined that, because of the amount of arthritis the claimant has in the posterior facet joints at C4-C5, fusion at C4-C5 is a better approach than disc replacement

surgery at that level. He stated that, when the facet joints in the back are arthritic, putting a new disc in the front will not fix the problem as the arthritis still remains in the back. According to Dr. O'Boynick, the claimant's 2011 fusion surgery at C5-C6 and C6-C7 likely played a role in the development of the arthritic changes and his current pathology at C4-C5. Dr. O'Boynick also testified that the claimant's current condition at C4-C5 could have developed through normal degeneration and contribution from the prior fusion, regardless of the type of work activities the claimant completed.

¶ 25    Dr. Matthew Gornet, a board-certified orthopedic spine surgeon, testified by evidence deposition that he performed a records review on behalf of Empire, but did not examine the claimant. Dr. Gornet reviewed a job video depicting some of the claimant's work activities. He also reviewed the claimant's May 13, 2010 MRI films of his cervical spine and the 2011 MRI films following his two-level cervical fusion at C5-C6 and C6-C7. Dr. Gornet reviewed medical records from Dr. Poulos' treatment in 2010 and 2011, and the March 2011 FCE. Dr. Gornet also reviewed the medical records from Dr. Dusek and Dr. O'Boynick, as well as the films from the November 6, 2015 cervical spine MRI. Additionally, Dr. Gornet reviewed a 2012 MRI of the claimant's shoulder as well as shoulder treatment records from 2015. Dr. Gornet testified that he could not comment on the shoulder because it is not his area of expertise; however, he did state that it is common for patients to experience pain in their shoulders arising from an issue in the cervical spine. Dr. Gornet maintained that he could not speculate as to whether the claimant had neck symptoms or complaints during the period between 2012 and 2015 (when the claimant first saw Dr. Dusek after the alleged October 1, 2014 work related injury) because of the time gap in the records he reviewed.

¶ 26     Dr. Gornet noted that the May 13, 2010 cervical spine MRI films revealed disc pathology at C4-C5, C5-C6, and C6-C7, including loss of disc height, central disc protrusions and an indication of an annular tear at C4-C5, which he opined would cause neck pain and symptoms in the left upper extremity. Dr. Gornet noted that, on January 5, 2011, the claimant underwent an anterior cervical discectomy and fusion at C5-C6 and C6-C7. Dr. Gornet testified that, although he has performed discectomy and fusion surgery many times before, he now performs more disc replacement surgeries because they result in higher patient satisfaction, earlier return to work, and better functional outcomes.

¶ 27     According to Dr. Gornet, the revision rate following a two-level fusion surgery is 20 to 40%. He also stated that there is a higher chance of a patient failing to heal at one level of a multi-level fusion, which could cause ongoing neck pain and require revision surgery. Dr. Gornet explained that, after a successful fusion, there are adjacent level stresses placed on the cervical spine and that the decision to place an adjacent level stress on a level that already shows significant disc pathology would cause rapid deterioration of that adjacent level. Dr. Gornet opined that the November 6, 2015 cervical MRI showed a failed fusion at C6-C7 and significant deterioration of the disc and disc pathology at C4-C5, greater on the left than the right. Dr. Gornet testified that he would have recommended a single or double level disc replacement rather than the fusion from C5 to C7 recommended by Dr. O'Boynick.

¶ 28     Dr. Gornet admitted that the claimant's work activities could make him more symptomatic, but opined that they did not contribute to the need for the fusion revision at C6-C7 or the surgery that Dr. O'Boynick recommended. Dr. Gornet also opined that the claimant's work activities did not contribute to the rapid deterioration at C4-C5, which he believed had begun shortly after the 2011 cervical fusion, due to increasing loads on the adjacent disc. Dr.

Gornet opined that the claimant's neck pathology at C4-C5 would have occurred independent of his work activities and that the 2011 fusion from C5 to C7 caused rapid deterioration and disc pathology at C4-C5 and resulted in the failed fusion at C6-C7. According to Dr. Gornet, the claimant's need for surgery is directly based on his 2011 fusion at C5-C6 and C6-C7. Dr. Gornet noted that a single level fusion increases intradiscal stress by 150 to 300% and that with two fusions present, coupled with a clear disc pathology on the left at C4-C5, the claimant was "set up" to have an early failure of the prior fusion at C6-C7.

¶ 29 Dr. Gornet agreed that the pain the claimant now has in his right shoulder is a new complaint from his original left shoulder pain, and constitutes a change in his original symptom presentation. Based on the findings in the November 2015 cervical MRI, Dr. Gornet recommended disc replacement surgery at C3-C4 and C4-C5 and revision of the claimant's failed fusion at C6-C7.

¶ 30 Following a hearing, the arbitrator found both that the claimant failed to prove that he sustained an accidental injury arising out of and in the course of his employment with Empire and that his current condition of ill-being is not causally connected to a work accident. Consequently, the arbitrator declined to award benefits under the Act and awarded Empire a credit of $4,699.23 under section 8(j) of the Act (820 ILCS 305/8(j)(2) (West 2012)).

¶ 31 The claimant sought review of the arbitrator's decision before the Commission. The Commission affirmed and adopted the arbitrator's decision, with one commissioner dissenting. The dissenting commissioner found that the majority's reliance on Dr. Matthew Gornet's medical opinion—that the claimant's current condition of ill-being is not causally related to his alleged October 1, 2014 work accident—over Dr. Christopher O'Boynick's medical opinion—

that the claimant's current condition of ill-being was aggravated by his October 1, 2014 work accident—is misplaced.

¶ 32    The claimant sought judicial review of the Commission's decision in the circuit court of St. Clair County. The circuit court confirmed the Commission's decision, and this appeal followed.

¶ 33    The claimant first argues that the Commission's finding, that his accident did not arise out of and in the course of his employment and that his current condition of ill-being is not causally related to his alleged October 1, 2014 work accident, is against the manifest weight of the evidence. We disagree.

¶ 34    An injury is compensable under the Act only if it "aris[es] out of and in the course of" one's employment. 820 ILCS 305/2 (West 2012). The claimant has the burden of establishing by a preponderance of the evidence the elements of his claim, including "some causal relation between the employment and the injury." *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 63 (1989). There must be some causal relation between the employment and an employee's injury to justify benefits under the Act. *Absolute Cleaning/SVMBL v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 463, 469 (2011). Whether a causal relationship exists between a claimant's employment and his condition of ill-being is a question of fact to be resolved by the Commission, and its resolution of the issue will not be disturbed on review unless it is against the manifest weight of the evidence. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984).

¶ 35    In finding that there was no causal connection between the claimant's employment and his current condition of ill-being, the Commission gave considerable weight to the medical opinion of Dr. Gornet over that of Dr. O'Boynick. After reviewing the medical records of the

claimant, the MRI of the claimant's shoulder, the CT scan of his cervical spine, MRIs of the claimant's cervical spine before and after his 2011 fusion at C5-C6 and C6-C7, and a video of some of his work duties, Dr. Gornet opined that the claimant's October 1, 2014 work activities may have increased his symptoms, but that they did not cause his current condition of ill-being or his need for surgery. Although Dr. Gornet admitted that commenting on the claimant's shoulder pain was not his area of expertise, he did state that it is common for patients to experience pain in their shoulders arising from an issue in the cervical spine. According to Dr. Gornet, the degeneration at C4-C5 was the source of the claimant's shoulder pain and neck pain and was not causally related to his alleged October 1, 2014 work accident, as the degeneration at C4-C5 would have occurred regardless of the claimant's work activities. Although, the Commission found Dr. O'Boynick's causation opinion less persuasive, he also opined that the source of the claimant's bilateral shoulder pain was at the C4-C5 level of his cervical spine and that the current condition of the C4-C5 level could have developed through normal degeneration and contribution from the 2011 fusion, regardless of the type of work activities the claimant completed. Dr. Gornet further opined that the 2011 failed fusion at C5-C6 and C6-C7 contributed to the degeneration at C4-C5 because of the increased intradiscal stress placed on C4-C5.

¶ 36    It was the function of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Ghere v. Industrial Comm'n*, 278 Ill. App. 3d 840, 847 (1996). Moreover, we will affirm a decision of the Commission if there is any basis in the record to do so, regardless of whether the Commission's reasoning is correct or sound. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 283 Ill. App. 3d 785, 793 (1996). Applying these standards and based upon the record before us, we conclude that the Commission's finding that the

claimant failed to prove that his current condition of ill-being is causally connected to his October 1, 2014 work accident, is not against the manifest weight of the evidence.

¶ 37    Additionally, we note that the Commission did not err when it determined that the claimant waived his right to seek benefits for his current condition of ill-being pursuant to the language of his two 2012 settlement agreements for his cervical spine and left shoulder claims. The settlement agreements provide that the claimant waives his right to any additional medical treatment for "the results of [his cervical spine or left shoulder] injur[ies]" and any additional benefits if his condition worsens "as a result of [his cervical spine and left shoulder] injur[ies]." The Commission found that the claimant's current condition of ill-being, degeneration at C4-C5 of his cervical spine, causing shoulder pain, stemmed from his 2011 fusion at C5-C6 and C6-C7. Therefore, the claimant's current condition of ill-being is not a new injury causally related to his October 1, 2014 work accident, but is rather, a worsening of his cervical spine from a previous work injury. Consequently, the claimant is barred from seeking benefits for his current condition of ill-being. See *Rogers v. Indus. Comm'n*, 213 Ill. App. 3d 837, 842 (1991).

¶ 38    Having found no error in the Commission's causation finding, we need not reach the claimant's remaining arguments on appeal.

¶ 39    For the reasons stated, we affirm the judgment of the circuit court of St. Clair County, which confirmed the decision of the Commission.

¶ 40    Affirmed.