CERTIFIED TESTING, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Michael Nixon, Appellee).

Fourth District (Illinois Workers' Compensation Commission Division)
No. 4—06—0039WC

Opinion filed September 28, 2006.

Kenneth F. Werts (argued) and Julie A. Webb, both of Craig & Craig, of Mt. Vernon, for appellant.

Donald L. Woods (argued), of Law Offices of Lee & Harvatin, of Springfield, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

Claimant, Michael Nixon, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2002)) for injuries he sustained to his right knee on November 22, 2002, while working for employer, Certified Testing. Following a hearing on claimant's section 19(b) petition (820 ILCS 305/19(b) (West 2002)), the arbitrator determined that claimant's injuries arose out of and in the course of his employment and awarded him 13½ weeks' temporary total disability (TTD) benefits and medical expenses. The Industrial Commission[1] (Commission) affirmed and adopted the arbitrator's decision and remanded the cause for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327, 332-35 (1980). The trial court confirmed the Commission's decision, and employer appeals. We affirm.

## I. BACKGROUND

Claimant, age 51, has been a member of the Sheet Metal Workers,

---

[1]Now known as the Illinois Workers' Compensation Commission. See Pub. Act 93—721, eff. January 1, 2005.

Local 218 (Local 218), for over 29 years. On November 22, 2002, employer hired claimant to work at Normal Community High School in Bloomington-Normal. Claimant walked up stairs to a lower roof of the building and then climbed an extension ladder from the lower roof to the penthouse. On his way back down the ladder, claimant carried approximately 75 to 80 pounds of gear on his shoulders and felt a burning sensation in his right knee. He "had a horrific time trying to get off the ladder. [He] had to really slowly come down the ladder." Claimant testified that when his partner, Chuck Helms, arrived, he told Helms that he had hurt his knee.

On November 21, 2002, the day before the alleged accident, claimant weighed approximately 380 pounds. He testified that he had a previous knee problem. A January 11, 2001, note from Dr. Michael Wall, claimant's primary care physician for 10 to 12 years, reflects that claimant complained of having right knee pain off and on for several weeks. At that time, claimant did not provide a history of trauma or injury to the knee and he indicated that he was taking over-the-counter medications without relief. Claimant experienced grinding in his right knee, and Dr. Wall diagnosed him with crepitus and internal derangement. In February 2002, Dr. Wall prescribed claimant a knee brace for his right knee. Claimant testified that his prior knee problems did not cause him to miss work or prohibit him from performing his regular duties. Claimant's union employment records that were admitted into evidence confirm that his prior knee problems did not restrict or prohibit him from performing his job duties.

After discussing his injury with Helms, claimant telephoned Dr. Wall and scheduled an appointment to see him immediately. Dr. Wall's notes of his initial examination of claimant's injury indicate that claimant's chief complaint was "[r]ight knee pain/injured a long time ago but woke up this a.m. with terrible pain" and:

"[Claimant] presents today with complaints of right knee pain which has been a chronic problem for 3 years. [Claimant] states he injured it 3 years ago, and since that time has had occasional flare ups of his knee pain. He states that over the past week he has been doing a lot of ladder climbing and over this week he has noticed increased swelling and pain to his right knee. He denies any specific new injury to the knee."

At arbitration, claimant disagreed with Dr. Wall's notations that he woke up with pain and that the injury had been a chronic problem for three years. When asked whether he had denied a new injury, claimant explained "Well, it's not like I fell off the ladder or anything like that. It's the burning sensation I felt when I was coming down the

ladder with my equipment on my shoulder. That's—I mean, I don't know how else to put it, except, that's when it happened. I was stretched out, and I had the burning sensation."

Dr. Wall recommended an MRI, which revealed an "anterior cruciate ligament tear of indeterminate age, with prominent narrowing of the patellorfemoral joint with regional osteophyte formation consistent with severe changes of chondromalacia of the patella." Dr. Wall referred claimant to Dr. Michael Trice, an orthopedic specialist. Dr. Trice examined claimant on November 27, 2002. His notes indicate that on November 22, 2002, claimant felt a sharp pain in his knee while going up the ladder and the pain was worse going down. Dr. Trice diagnosed possible internal derangement and anterior cruciate ligament strain and recommended arthroscopic surgery. Claimant underwent surgery on December 9, 2002, which confirmed internal derangement and revealed a torn medial meniscus, patellofemoral chondromalacia, medial femoral chondromalacia, and a 50% tear of his anterior cruciate ligament. One of Dr. Trice's records pertaining to claimant's surgery lists November 22, 2002, as the date that claimant's condition first appeared and states that claimant had not been treated for his condition within the past two years.

After surgery, claimant continued to treat with Dr. Trice. Due to ongoing right knee pain, claimant received Hylagen injections in an attempt to alleviate the symptoms. Claimant attended three sessions of work hardening and was advised to continue a rehabilitation program at the YMCA. On February 27, 2003, Dr. Trice released claimant to work, effective March 3, 2003. In his May 22, 2003, notes, Dr. Trice opined that there was a causal relationship between claimant's injury and the symptoms he developed and, while the accident did not cause the arthritis found in claimant's knee, the injury resulted in damage to his ligament and cartilage.

After completing some physical therapy, claimant attempted to return to work for another company. He worked for two weeks, but stopped because the knee injections he had received did not work as hoped. Claimant did not work from July 2003 through the date of the hearing, December 5, 2003.

Dr. Michael Watson evaluated claimant on August 19, 2003, at the request of claimant's counsel. Dr. Watson's narrative report and deposition were admitted into evidence. Prior to his examination of claimant, Dr. Watson reviewed claimant's medical records from Drs. Wall and Trice. Dr. Watson explained that claimant told him that he injured himself on November 22, 2002, while climbing an extension ladder with equipment on his back and that, although claimant had experienced prior, intermittent problems with his right knee, none

caused as much intense pain or trouble as the accident on November 22, 2002. Dr. Watson examined claimant's right knee, and the results were consistent with a partial thickness tearing of his anterior cruciate ligament. Also, X rays revealed moderately advanced osteoarthritis. In his narrative report, Dr. Watson opined that the November 2002 injury aggravated a preexisting condition and, because the condition was now more severe, claimant may have difficulty climbing when carrying heavy equipment, as is required by his job.

In his deposition, Dr. Watson opined that joint replacement surgery would be risky due to claimant's age and weight, although it was one option to be considered as a last resort. Dr. Watson stated, "I felt it was possible that he may not be able to go back and do such activities as climbing and carrying heavy equipment, so really his options were very limited." Dr. Watson further opined that, based on the history provided, claimant's preexisting knee condition was aggravated by climbing the ladder while bearing additional weight. Also, the ladder climbing may have partially torn claimant's anterior cruciate ligament; however, Dr. Watson could make no definite conclusion in that regard. Moreover, he opined that the accident aggravated claimant's preexisting chondromalacia and osteoarthritis condition to the point where the surgery performed by Dr. Trice was necessary.

During Dr. Watson's deposition, claimant's counsel asked whether Dr. Watson would restrict claimant's employment as a sheet metal worker. Employer's counsel objected pursuant to "Section 12." The objection was overruled, and Dr. Watson testified:

"I think, as I stated in my narrative, that it would be—well, that he would not be able to do things like climb stairs, climb ladders, particularly with carrying heavy equipment, and even more particularly carrying equipment up ladders and stairs, so climbing I think is out. Heavy carrying would be out. He may even be limited in his ability to walk for long periods of time and squat and kneel and those sorts of things. *** [N]o, I don't think that he would be able to do all of his duties as a sheet metal worker the way I understand that a sheet metal worker works."

On cross-examination, employer's counsel asked Dr. Watson:

"Q. Now, he told you that as he ascended this ladder that he was having no problems with his knee and then noticed problems with his knee after he ascended the ladder?

A. Well, I think it's an important point and that's why I described it in my narrative the way I did because he described specifically a sudden, sharp pain in his knee while he was going up the ladder as opposed to I went up the ladder and I came down and my knee got real sore, so I mean he attributed it to a specific point of climbing the ladder that he had a sudden, sharp pain.

Q. And I think you testified on direct that he told you he was working fine prior and then had pain after. Is that correct?

A. That's what he told me, yes.

Q. Now that history is important to you, isn't it?

A. It's very important."

At arbitration, employer submitted a one-page letter from Dr. James Strickland of the St. Louis Orthopedic Institute. Dr. Strickland did not examine claimant. However, after reviewing claimant's medical records, including those from Drs. Wall, Trice, and Watson, he opined that any future surgery that claimant might need on his knee would not be related to his work injury, but would instead be related to preexisting degenerative joint disease.

Robert Champion, Jr., testified that he is a business agent for Local 218 and is responsible for sending members to jobs within his jurisdiction. Champion has known claimant since November 1980 and worked with claimant as a sheet metal worker. In the 1990s, Champion sent claimant to work at different contracting jobs as a sheet metal worker and claimant was able to perform his usual and customary duties. After November 22, 2002, claimant could no longer perform his usual duties. Claimant is designated as injured, and Champion will not call him for jobs until he receives notification that claimant is physically ready to work.

Chuck Helms, Jr., testified that he works for employer and is a member of Local 218. Helms worked with claimant on a Danville project and on the November 2002 Bloomington-Normal school project. On the Danville job, which was in the fall but before the Bloomington job, Helms noticed that claimant walked with a limp. According to Helms, on the Bloomington job, claimant stated that he had some knee problems that he had neglected to have treated. Helms testified that claimant told him, at both the Danville and Bloomington jobs, that he had a hard time getting up and down ladders. Helms served as the lead man, similar to a foreman, on the Bloomington job. When a person is injured on the job, he or she is supposed to notify the lead man of the injury and the lead man, in turn, tells his or her boss. Helms testified that claimant did not report being injured on the Bloomington job. However, claimant and Helms were working on different sides of the roof, and Helms confirmed that claimant could have injured his knee and Helms would not have witnessed the injury.

Mark Moleski testified that he works for employer and is a member of Local 218. Moleski met claimant on the Danville job and noticed that claimant walked with a limp. Moleski testified that claimant told him that his leg had been bothering him and that he had been putting off having it treated. Claimant was not, however, under any kind of restricted duty on the Danville job.

On rebuttal, claimant testified that he walks with a limp because his big toe on his left foot was amputated in 1983. He admitted that he did tell Helms and Moleski that he needed to have his knee treated.

On January 30, 2004, the arbitrator found a causal relationship between the November 22, 2002, accident and claimant's injuries. The arbitrator awarded claimant 13½ weeks' TTD benefits and medical expenses. The Commission affirmed and adopted the arbitrator's decision and remanded the cause for further proceedings pursuant to *Thomas*, 78 Ill. 2d at 332-35. The trial court confirmed the Commission's decision. In doing so, the trial court found no error in the Commission's decision not to rule on prospective medical care, holding that the Commission's decision not to rule may have been purposeful or the Commission may have determined that the issue was not yet ripe. Employer timely appealed.

## II. ANALYSIS

### A. Arising Out of and in the Course of Employment

■ Employer argues that the Commission's finding that claimant sustained an injury arising out of and in the course of his employment on November 22, 2002, was against the manifest weight of the evidence. To obtain compensation under the Act, a claimant's injury must be one "arising out of and in the course of the employment." *Parro v. Industrial Comm'n*, 167 Ill. 2d 385, 393 (1995). Both elements must be present at the time of injury, and the claimant bears the burden of proving the elements of his or her claim. *Beattie v. Industrial Comm'n*, 276 Ill. App. 3d 446, 449 (1995). In analyzing the "arising out of" component, we are primarily concerned with a causal connection. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003). The accident need not be the sole or principal cause, as long as it was a causative factor in a claimant's condition of ill-being. *Sisbro*, 207 Ill. 2d at 205.

Employer contends that the Commission's determination was against the manifest weight of the evidence because claimant's testimony regarding his workplace injury is contradicted by his coworkers' testimonies and contemporaneous medical records. Specifically, it relies on Helms' testimony that claimant never reported a work injury and notes that Helms and Moleski both testified that they witnessed claimant limping prior to November 22, 2002.

The question whether claimant's injury arose out of and in the course of his employment is a question of fact for the Commission, and its determination will not be disturbed on review, unless it is against the manifest weight of the evidence. *Joiner v. Industrial Comm'n*, 337 Ill. App. 3d 812, 815 (2003). A finding is not against the

manifest weight of the evidence if there was sufficient evidence in the record to support the Commission's determination. *Homebrite Ace Hardware v. Industrial Comm'n*, 351 Ill. App. 3d 333, 337 (2004).

Regarding the coworkers' testimonies, we note first that Helms conceded that, on November 22, 2002, he and claimant worked on different sides of the roof and that claimant could have injured his knee without Helms knowing. Moreover, although Helms, who was still employed by employer at the time of his testimony, testified that claimant did not report the injury, claimant testified that he *did* report the injury to Helms. It is the Commission's function to judge the credibility of witnesses, and we cannot say that the Commission erred in crediting claimant's testimony. *Kishwaukee Community Hospital v. Industrial Comm'n*, 356 Ill. App. 3d 915, 920 (2005). As to claimant's being seen limping prior to November 22, 2002, his explanation that he limped due to an amputated toe was unrebutted. In any event, employer's argument somewhat misses the mark. Claimant admitted having prior knee problems; however, he testified that his knee problems worsened significantly after he experienced a burning sensation in his knee while descending a ladder. Employer does not address the well-settled principle that aggravations of preexisting injuries are generally compensable. See, *e.g.*, *Riteway Plumbing v. Industrial Comm'n*, 67 Ill. 2d 404, 412 (1977); *Kishwaukee Community Hospital*, 356 Ill. App. 3d at 922.

Regarding the medical records, employer first contends that claimant's assertion of a workplace injury is belied by Dr. Wall's records, which reflect that claimant suffered an earlier knee injury, awoke the morning of November 22, 2002, with pain in his knee, and denied a new injury when examined. Claimant, however, testified that he disagreed with Dr. Wall's note that he awoke with pain. Moreover, claimant explained that he denied a new injury only in the sense that he did not, for example, fall off a ladder. We do not find the Commission's decision to credit claimant's explanation unreasonable.

Employer next argues that Dr. Trice's surgical record falsely states that claimant had not been treated for his condition within the past two years and, thus, Dr. Trice's causation opinion was based on an inaccurate history and must be disregarded. We believe that employer ignores the type of medical record at issue and the context in which it was prepared. The medical record appears to be a postoperative form, listing claimant's date of surgery, dates of hospital admission, and type of surgery. The form indicates that claimant's injury occurred on November 22, 2002, and that he had not been treated for his condition within the past two years. Given that claimant did not have any prior knee surgeries and that the form was completed at a surgeon's request,

we do not believe that this history is necessarily incorrect. In our view, this record does not reflect that Dr. Trice possessed an inaccurate understanding of claimant's condition, nor does it diminish his causation opinion.

Finally, employer notes that Dr. Watson found claimant's statement that he was going up the ladder when injured very important in formulating his opinion, yet claimant's testimony and medical records reflect that he felt pain while descending the ladder. Thus, employer argues, Dr. Watson's opinion must also be disregarded. Again, employer ignores the context of Dr. Watson's testimony. While Dr. Watson acknowledged that claimant's history was important, he did not indicate that claimant's direction on the ladder when he felt pain was critical to his opinion. Rather, Dr. Watson explained that he found claimant's description of a sudden, sharp pain, in contrast to a general soreness, important in formulating his opinion.

We conclude that there was sufficient evidence in the record from which the Commission could reasonably have found a causal connection between claimant's work accident and his condition of ill-being. It is undisputed that claimant experienced some knee problems prior to his November 22, 2002, accident. However, claimant's medical records that predate the accident confirm that, while claimant made prior complaints regarding his knee, Dr. Wall did not refer claimant to an orthopedic specialist prior to the accident. Claimant testified that his prior knee problems did not cause him to miss work or in any way prohibit him from performing his regular duties. Claimant's union employment records confirm that his prior knee problems did not restrict him or prohibit him from performing his job duties. Prior to November 22, 2002, claimant had not been diagnosed with or treated for a tear of his anterior cruciate ligament or considered for possible knee replacement surgery. Dr. Trice opined that claimant's accident resulted in damage to his ligament and cartilage. Dr. Watson opined that the accident aggravated claimant's preexisting chondromalacia and osteoarthritis condition to the point where the surgery performed by Dr. Trice was necessary. The Commission may attach great weight to the treating physician's opinion. *Homebrite Ace Hardware v. Industrial Comm'n*, 351 Ill. App. 3d 333, 340 (2004). In sum, we conclude that the Commission's finding that claimant's injury arose out of and in the course of his employment was not against the manifest weight of the evidence.

## B. Section 12 Objection

■ Employer argues that the Commission erred in overruling its objection, pursuant to section 12 of the Act, made during Dr. Watson's

deposition. Evidentiary rulings made during the course of a workers' compensation case will not be disturbed on review absent an abuse of discretion. *Homebrite Ace Hardware*, 351 Ill. App. 3d at 337. An abuse of discretion occurs when no reasonable person would adopt the view taken by the lower tribunal. *Homebrite Ace Hardware*, 351 Ill. App. 3d at 337.

Section 12 of the Act provides, in pertinent part:

> "In all cases where the examination is made by a surgeon engaged by the injured employee, and the employer has no surgeon present at such examination, it shall be the duty of the surgeon making the examination at the instance of the employee, to deliver to the employer, or his representative, a statement in writing of the condition and extent of the injury to the same extent that said surgeon reports to the employee and the same shall be an exact copy of that furnished to the employee, said copy to be furnished the employer, or his representative, as soon as practicable but not later that 48 hours before the time the case is set for hearing. *** If such surgeon refuses to furnish the employer with such statement to the same extent as that furnished the employee, said surgeon shall not be permitted to testify at the hearing next following said examination." 820 ILCS 305/12 (West 2002).

The purpose of requiring the claimant's physician to send a copy of the written statement to employer no later than 48 hours before the hearing is to prevent the claimant from springing surprise medical testimony on the employer. *Ghere v. Industrial Comm'n*, 278 Ill. App. 3d 840, 845 (1996); see also *Homebrite Ace Hardware*, 351 Ill. App. 3d at 338; *Kishwaukee Community Hospital*, 356 Ill. App. 3d at 923-24.

Employer admits that it received a written report from Dr. Watson, dated August 19, 2003, and it does not suggest that the report was furnished less than 48 hours prior to hearing. Rather, employer contends that Dr. Watson's opinion regarding whether he would restrict claimant's employment as a sheet metal worker went beyond the opinions rendered in his August 19, 2003, report. Employer likens this case to *Ghere*, where an employer's section 12 objection was sustained because the physician opined on factors contributing to the claimant's heart attack when he had never treated the claimant for heart problems. *Ghere*, 278 Ill. App. 3d at 846. There, the court determined that the employer was unfairly surprised by the medical testimony. *Ghere*, 278 Ill. App. 3d at 846. Here, Dr. Watson examined claimant's knee, opined on the severity of claimant's knee injury, and, in his report, expressed doubt as to whether claimant would be able to perform aspects of his job. Specifically, Dr. Watson's narrative report states that he found claimant's condition to be severe and that claim-

ant may now have difficulty climbing stairs and ladders, particularly while carrying heavy equipment, "which is required by his job." In his deposition, Dr. Watson was asked whether, based on his assessment of claimant's knee, he would recommend that claimant's work be restricted. It was reasonable for the Commission to find that Dr. Watson's deposition testimony was a natural continuation of the opinion in his narrative report and that his opinion, that claimant's condition would restrict his ability to perform his job as a sheet metal worker, did not come as a surprise to employer. Thus, we conclude that the Commission did not abuse its discretion in overruling employer's section 12 objection.

## C. Prospective Medical Treatment

■ Employer's final argument is that the Commission erred in failing to address and deny prospective medical treatment. Employer notes that the parties identified prospective medical treatment as an issue in dispute; however, both the arbitrator and the Commission failed to address the issue. Employer relies, in part, on section 7030.80 of Title 50 of the Administrative Code, which provides that, after the closing of proofs, the arbitrator must issue a written decision that includes the arbitrator's findings of fact and conclusions of law on each contested issue. 50 Ill. Adm. Code §7030.80 (2002). Employer notes that Dr. Strickland's opinion, that any future need for surgery would be due to claimant's preexisting knee problems, is unrebutted. Thus, it contends that we should, in the first instance, determine the issue and conclude that claimant's need for future surgery is not causally related to his November 22, 2002, injury.

Section 8(a) of the Act entitles claimant to compensation for all necessary medical, surgical, and hospital services "thereafter incurred" that are reasonably required to cure or relieve the effects of injury. 820 ILCS 305/8(a) (West 2002). Prescribed services not yet performed or paid for are considered to have been "incurred" within the meaning of the statute. *Homebrite Ace Hardware*, 351 Ill. App. 3d at 341; *Bennett Auto Rebuilders v. Industrial Comm'n*, 306 Ill. App. 3d 650, 655 (1999). Where, as here, a matter involves a section 19(b) petition, an employer may challenge the cost and necessity of a prospective surgery in subsequent proceedings. *Homebrite Ace Hardware*, 351 Ill. App. 3d at 341-42; *Bennett Auto Rebuilders*, 306 Ill. App. 3d at 656. Thus, we conclude that the Commission's failure to resolve the prospective medical treatment issue here was not erroneous because the opportunity for employer to challenge the necessity and cost of claimant's future surgeries remains available.

However, a note of caution is warranted. Employer's contention

that the Commission should follow its own rules and address all issues before it is well-taken. Indeed, parties commit significant time and valuable resources to preparing contested issues for the Commission's review, and they deserve a resolution of those issues in return. And, while we conclude here that the Commission's failure to resolve the prospective medical treatment issue does not warrant reversal, our conclusion would very likely differ in another context.

## III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Macon County is affirmed, and the cause is remanded to the Commission for further proceedings pursuant to *Thomas*, 78 Ill. 2d at 332-35.

Affirmed and remanded.

McCULLOUGH, P.J., and HOFFMAN, HOLDRIDGE, and GOLD-ENHERSH, JJ., concur.