2020 IL App (5th) 190361WC-U
No. 5-19-0361WC
Order filed: September 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| WILEY MOORE, | ) | Appeal from the Circuit Court |
| | ) | of Madison County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-MR-717 |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION, *et al.*, and GLEESON | ) | |
| ASPHALT, INC., | ) | Honorable |
| | ) | David Dugan, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Commission's decision that claimant's condition of ill-being was not causally related to his at-work accident was not against the manifest weight of the evidence; Commission did not abuse its discretion in refusing to admit various items of evidence tendered by claimant.

¶ 2                                I. INTRODUCTION

¶ 3      Claimant, Wiley Moore, appeals a decision of the Illinois Workers' Compensation Commission (Commission) finding that his condition of ill-being was not causally related to a work-related accident while in the employ of respondent, Gleeson Asphalt, Inc.  Claimant also raises several evidentiary issues.  The arbitrator found claimant had experienced a work-related accident; however, she further found that his current condition of ill-being was not causally related to that accident.  The Commission affirmed, adopting the decision of the arbitrator, with one commissioner dissenting.  The circuit court of Madison County first remanded the cause for the Commission to address an evidentiary issue and then, after the Commission resolved that issue favorably to respondent, confirmed the Commission's decision.

¶ 4                                II. BACKGROUND

¶ 5      Claimant was employed by respondent.  On November 20, 2013, claimant was injured when he stepped into an open manhole.  He sought treatment from Dr. Carr.  He related to Carr how he had been injured, and Carr directed him to see a neurologist.  Claimant also sought care from Dr. Kai-Chun Yang on November 22, 2013.[1]  Claimant then saw Dr. Gregory Randle of Vigilant Pain Management, who administered "a series of nerve blocks."  These provided only short-term relief.  Subsequently, he was referred to Dr. Scott Purvines.  Purvines, a board-certified neurosurgeon, examined claimant and recommended that an MRI be performed.

--------

[1]Many providers' records have not been made part of the record, and the information referenced is taken from a report authored by one of respondent's independent medical examiners, who conducted a record review.

¶ 6     On May 13, 2014, Dr. Robert Backer examined claimant on respondent's behalf. Backer agreed that an MRI should be done, and claimant had one performed on June 2, 2014. Backer opined, *inter alia*, that claimant's injury was work related. Purvines examined the MRI and opined that it showed abnormalities at C4-5 and C5-6. Purvines recommended an anterior cervical discectomy and fusion. In January 2015, respondent had Dr. Richard Lehman perform a review of claimant's medical records. Lehman opined that claimant's condition of ill-being was not related to his at-work accident.

¶ 7     At the arbitration hearing, claimant testified that he was employed by respondent, an asphalt company, for about three months before his injury. Claimant stated that he was a "labor supervisor." He had previously worked for other employers out of his union hall. He performed "heavy highway" work. He would do things like lay sewer pipe and concrete work. Concrete forms weighed up to 150 pounds.

¶ 8     On the day of his accident claimant was walking backwards, pulling plastic sheeting over some freshly poured concrete to protect it from the rain. He stepped into an open manhole. His right leg went into the hole, his left leg remained above ground, and claimant fell backwards. Another employee assisted claimant out of the hole, and claimant decided to "try to walk it off." Due to the rain, work ceased at about 1 p.m. or 1:30 p.m. that day. Claimant's injuries were to his right elbow, right shoulder, right knee and his back and/or neck.

¶ 9     After work, claimant went to see Dr. Carr "to see if he could adjust [claimant] out." He related to Carr how he had been injured, and Carr directed him to see a neurologist. Claimant also sought care from Dr. Yang on November 22, 2013. Thereafter, claimant saw Dr. Randle of Vigilant Pain Management, a neurologist, who administered "a series of nerve blocks." These provided only short-term relief. Subsequently, he was referred to Dr. Purvines. Purvines

examined claimant and wanted an MRI to be performed. Purvines scheduled claimant for surgery on September 17, 2014. Claimant was examined by Dr. Backer, respondent's first independent medical examiner (IME) at about this time. Backer concurred with Purvines's recommendation. The surgery was subsequently cancelled.

¶ 10    On cross-examination, claimant acknowledged that he was in an automobile accident on July 9, 2014. Paramedics put him in neck brace and took him to the hospital. Claimant agreed that he complained of an injury to his neck, but denied complaining about his right shoulder. On August 25, 2014, he was involved in another traffic accident. Claimant stated that he was injured on the job while working for a previous employer, Munie Greencare. The injury involved his neck. He was placed on light duty and was not sure if a workers' compensation claim was actually filed. He was represented by an attorney he obtained through his union. He received a settlement. On December 1, 2014, claimant went to the emergency room complaining of neck pain. He reported that the condition was aggravated during a home invasion. Claimant testified that this incident involved his left shoulder. He also stated that his condition had been aggravated by yard work. On redirect-examination, claimant stated that the injury at Munie Greencare had occurred five or six years earlier.

¶ 11    Dr. Purvines testified via evidence deposition. He stated that he is a board-certified neurosurgeon. Purvines first examined claimant in March 2014. Claimant reported that he had fallen into a hole and subsequently "developed neck, shoulder, and right upper extremity pain, and numbness that extended down to the palm of his hand into the fingers." Purvines ordered an MRI, which was performed on June 2, 2014. The MRI revealed "disc abnormalities at C4-5 and C5-6, and particularly at C4-5 that appeared consistent with the complaints he was having in his neck and upper extremity with the exception of the pain at the right shoulder, which [Purvines] thought

was consistent with a shoulder problem." On September 11, 2014, Purvines recommended a neck operation: "a C4-5 and C5-6 anterior cervical discectomy and fusion." Purvines opined that the accident history related by claimant was consistent with his injuries.

¶ 12    On cross-examination, Purvines stated that he did not recall discussing any history of neck problems predating the accident at issue in this case. Purvines added that he likely did not ask claimant about any prior issues. Purvines agreed that he only reviewed the MRI taken as a result of claimant's current injury. In a report documenting claimant's visit on December 16, 2014 (which was the last time Purvines saw claimant), it is noted that Purvines restricted claimant from working. Purvines did not review any records concerning a visit claimant made to Alton Memorial Hospital on May 16, 2008. Purvines was not aware that at about this time, claimant was experiencing neck pain stemming from an automobile accident. Purvines also did not review records from St. Anthony's Health Center dated November 16, 2009, when a tree fell and struck claimant in the back. Claimant did not relate to Purvines that in November 2009, he had experienced numbness and pain in the right arm. Purvines did not review the MRI that was taken at this time, nor did he review a cervical MRI taken in November 2011, after claimant fell down some stairs. Purvines had not compared the current MRI to any past MRIs. When asked whether seeing these earlier MRIs would alter his opinion, Purvines replied, "That's a difficult question to answer since I haven't seen them." He continued, "In my opinion, the new MRIs demonstrate an acute abnormality, however, that likely isn't years old." On redirect-examination, he explained that he did not believe the abnormality to be years old because claimant's injury appeared to be of the soft tissue rather than hard bone.

¶ 13    Dr. Richard C. Lehman, respondent's second independent medical examiner, also testified by evidence deposition. At respondent's request, Lehman reviewed materials relating to

claimant's accident that occurred on November 20, 2013. He also reviewed medical records dated May 16, 2008, regarding claimant being struck by a pickup truck. Claimant was treated at Alton Memorial Hospital, complaining of pain in both shoulders and his neck. An MRI taken that day showed "degenerative changes in the cervical spine in 2008 with mild uncovertebral joint degenerative changes, C4-5 changes and C5-6 changes with vertebral body spurring and facet arthritis."

¶ 14    Lehman testified that he reviewed medical records from St. Anthony's Health Center dated November 16, 2009. They indicated that claimant was injured when a tree fell and struck him in the back and right side of his neck. Claimant experienced "right flank pain, right-sided neck pain, [and] pain and numbness in the right arm while sleeping." Lehman also reviewed an MRI from December 3, 2009, which noted that claimant had been experiencing neck pain, right arm pain, and hand numbness since he was struck by a backhoe carrying a tree on November 9, 2009. Lehman reviewed an MRI performed on November 1, 2011, after claimant fell down some stairs, which showed increased degenerative changes at C4-5, foraminal narrowing at C4-5, "fairly substantial disc with spurring," "a large central disc osteophyte complex that increased in size between 2009 and 2011," and "effacement of the spinal cord." Lehman further reviewed an MRI dated June 2, 2014. He observed "degenerative disc disease at C4-5 and C5-6, a disc osteophyte complex at C4-5 and C5-6 resulting in moderate and mild central canal stenosis and moderate right foraminal stenosis at C4-5." Based on his review of the three MRIs, Lehman opined that claimant was suffering from "degenerative disc disease and elements of neural foraminal stenosis at C4-5 and C5-6 that caused some entrapment of the exiting nerve roots."

¶ 15    Lehman also reviewed Purvines's records from March 27, 2014, July 8, 2014, and September 11, 2014. He noted Purvines's opinions and recommendations. Lehman then opined

that claimant's problems derived from "a long-term degenerative process." He added, "The levels identified in 2009 and 2011 were the same levels treated currently" and "[t]here didn't appear to be anything different in terms of the levels in the underlying pathology." Claimant's condition "appeared to be a progression of the degenerative arthritis or degenerative disc disease." He noted nothing "suggestive of an acute process." He opined that claimant's condition of ill-being was not causally related to his at-work accident of November 20, 2013. Therefore, he concluded that the medical care claimant received was also not related to the accident. Lehman stated that while claimant did have a "significant problem," it was not related to his employment. He did not believe claimant's condition necessitated any work restrictions. Lehman opined that claimant would need conservative care going forward, but the need for it was not caused by the accident of November 20, 2013. Lehman stated that "[t]here doesn't appear to be anything that one could point to to say this is a recent event or this is an acute process," and that claimant had a "significant disease in his neck which he's had a long time." Lehman felt that prior medical records and scans were generally helpful in understanding a patient's condition.

¶ 16     On cross-examination, Lehman acknowledged that claimant had an immediate onset of pain after the accident. However, he added that this did not preclude claimant from having "significant issues" prior to the accident. Lehman further opined that claimant's fall did not exacerbate his condition, and he did not regard the onset of pain as necessarily being an aggravation of claimant's condition.

¶ 17     When asked whether he had ever been disciplined by Illinois or Missouri, Lehman responded, "I had a public reprimand in September when an attorney put a wire on a patient and asked me about a standard physical examination of the heart and lungs on somebody who was injured slipping in some water in a restaurant and injured their knee." He explained that medical

records indicated that he performed actions during an examination that he actually had not done, which he attributed to the electronic system used to generate medical records. Lehman acknowledged that he "agreed to the sanction." He later explained that a transcription service, using a template, had listed things in the records that had not actually occurred during the examination in question.

¶ 18    Dr. Robert J. Backer, respondent's first IME, prepared a written report. He examined claimant on May 13, 2014. In the report, he noted that claimant related the details of the accident to him; however claimant was "not very good at providing details." Claimant related that he had a prior injury to his neck, when a tree struck him. Claimant received an injection in his neck, and the pain subsided. Backer noted that MRIs had been performed in 2009 and 2011. He opined that claimant continued to experience pain and that this was related to his at-work accident of November 20, 2013. The medical care claimant received was causally related to the accident. Claimant should remain off work and be evaluated by an orthopedic surgeon. While claimant had no objective evidence of cervical radiculopathy or cervical injury, his condition is related to the at-work accident as "he complained of pain immediately." Claimant "probably should have an MRI of the cervical spine to complete the workup of his neck." Backer concluded:

> "To complete this workup I think [claimant] should proceed with an orthopedic evaluation of the shoulder. The orthopedist, more than likely, will request an MRI of the shoulder. If that is unrevealing, then to complete the workup, or simultaneously, it is probably reasonable to get an MRI of the cervical spine. Once these are completed then we should be able to give a final determination of his ability to return to work and whether he will require any further ongoing treatment."

¶ 19 The arbitrator found that claimant had sustained an accident arising out of and in the course of his employment with respondent on November 20, 2013, noting that claimant's testimony on this issue was undisputed. However, she further held that claimant had failed to prove his current condition of ill-being was causally related to his at-work accident. She found that claimant "was not altogether credible," noting various inconsistencies between his testimony and medical records. She also noted that claimant did not tell Purvines about two automobile accidents in which he was involved in 2014. The arbitrator further observed that most of claimant's medical records had not been admitted into evidence. She found Purvines's testimony unpersuasive because he did not have a "clear understanding" of claimant's earlier medical problems and had not reviewed the earlier MRIs. She acknowledged that Backer opined to the existence of a causal relationship; however, his opinion was provisional and he believed claimant should undergo another MRI to complete the workup of his cervical spine. In ruling on causation, the arbitrator did not rely on Lehman's testimony (outside of to note that some of claimant's medical records could be found in Lehman's report). She therefore denied all of his claims for benefits under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq*. (West 2012)). The arbitrator also ruled that a police report proffered during the arbitration hearing was hearsay and hence not admissible and that a deposition given by Lehman in a prior proceeding was also not admissible.

¶ 20 The Commission affirmed, adopting the decision of the arbitrator in its entirety. One commissioner dissented. He disagreed with the arbitrator's finding regarding claimant's credibility because the alleged inconsistencies she cited were "insignificant." He criticized the arbitrator's rejection of Purvines's testimony and asserted that respondent's retention of Lehman after Backer opined favorably to claimant "smack[ed] of 'doctor shopping.' "

¶ 21    The circuit court of Madison County remanded the cause to allow an evidentiary issue to be addressed. It noted that claimant argued that the arbitrator erroneously sustained respondent's objection to certain medical records (Claimant's Exhibit 3) offered by claimant. Respondent argued that claimant failed to comply with the following requirements of section 16 of the Act (820 ILCS 305/16 (West 2012)):

> "The records, reports, and bills kept by a treating hospital, treating physician, or other treating healthcare provider that renders treatment to the employee as a result of accidental injuries in question, certified to as true and correct by the hospital, physician, or other healthcare provider or by designated agents of the hospital, physician, or other healthcare provider, showing the medical and surgical treatment given an injured employee by such hospital, physician, or other healthcare provider, shall be admissible without any further proof as evidence of the medical and surgical matters stated therein, but shall not be conclusive proof of such matters. There shall be a rebuttable presumption that any such records, reports, and bills received in response to Commission subpoena are certified to be true and correct. *This paragraph does not restrict, limit, or prevent the admissibility of records, reports, or bills that are otherwise admissible.* This provision does not apply to reports prepared by treating providers for use in litigation." (Emphasis added.)

Respondent argued that these records were not certified as required by this section. The trial court noted that, given the italicized language, this section established an alternative, simplified method to render records admissible and did not operate to bar records that were otherwise admissible. Claimant argued that the parties stipulated to the admission of these records during the deposition of Lehman. The trial court, noting language from which a stipulation could be inferred, found the

language ambiguous and remanded to allow the Commission to consider whether such a stipulation existed.

¶ 22    On remand, the Commission found that no stipulation existed.  It noted that while there were statements indicating that claimant's attorney did not object to the admission of these records, there was no indication that respondent stipulated to their admission beyond those actually addressed at the deposition.  It further observed that it was not clear as to whether all of the records offered in Claimant's Exhibit 3 were addressed at the deposition.  It also found that the records were not otherwise admissible.  The trial court confirmed the decision of the Commission, and this appeal followed.

¶ 23                          III. ANALYSIS

¶ 24    On appeal, claimant raises three main issues.  We will first address claimant's argument that the Commission erred in not admitting his medical records contained in Claimant's Exhibit 3. Next, we will consider whether the Commission's decision regarding causation is against the manifest weight of the evidence (claimant raises two additional issues that are dependent on the resolution of this one).  Third, we will address claimant's argument that the Commission erred by not allowing the admission of deposition testimony given by Lehman in another case and a public remand he received from the State of Missouri.  Parenthetically, we note that claimant asserts that penalties should be awarded in the conclusion section of his opening brief; however, he offers no sustained argument on this point and we will therefore not consider it (*Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993)).  We now turn to claimant's arguments.

¶ 25             A. ADMISSION OF CLAIMANT'S MEDICAL RECORDS

¶ 26    In an argument raising at least five separate issues in the space of less than two pages, claimant argues that the Commission erred in denying admission of certain of his medical records

contained in Claimant's Exhibit 3. We deem this issue forfeited. *Obert*, 253 Ill. App. 3d at 682 ("Bare contentions in the absence of argument or citation of authority do not merit consideration on appeal and are deemed waived. [Citation.] A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error."). Moreover, we find claimant's contentions unpersuasive.

¶ 27 Claimant first (briefly) argues that there was a stipulation between the parties concerning the admission of these records. However, the Commission made a factual finding that no such stipulation existed. Generally, factual findings are reviewed using the manifest-weight standard. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984)), and we will reverse only if an opposite conclusion is clearly apparent (*Shafer v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶ 35). Claimant does not acknowledge this finding or attempt to explain why it is contrary to the manifest weight of the evidence. Moreover, our review of the record indicates that the Commission's finding has ample support. The Commission found that "while [claimant's] counsel appears to have had no objection to certain medical records going into evidence," "there is absolutely no evidence to suggest that [r]espondent's counsel stipulated to any records being admitted into evidence other than those offered at the time of the deposition." Claimant has not convinced us that this was error.

¶ 28 Claimant next asserts that if these records are not in evidence, the deposition of Lehman must be stricken as double hearsay. However, claimant does not identify where he objected to Lehman's testimony on that basis. The failure to object to hearsay "allows such evidence to be considered by the trier of fact and to be given its natural probative effect as if it was in law

admissible." *Botello v. Illinois Central R.R. Co.*, 348 Ill. App. 3d 445, 454 (2004). Moreover, claimant bore the burden of proof in the proceedings below (*Certified Testing v. Industrial Comm'n*, 367 Ill. App. 3d 938, 944 (2006)), and, as we read the Commission's decision, it was primarily based on having problems with claimant's credibility as well as finding Purvines unpersuasive. Claimant also argues that the fact that Lehman relied on certain medical records in forming his opinions renders them admissible. However, the mere fact that Lehman relied on these records does not create a general exception to the hearsay rule. See *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185 (1990).

¶ 29    Claimant also asserts that medical records have been deemed inherently reliable. We find the notion that there is some sort of blanket exception for medical records particularly unpersuasive. Various rules govern when medical records are sufficiently reliable to allow an exception to the hearsay rule. See, *e.g.*, *People v. Sapyta*, 235 Ill. App. 3d 1007, 1011 (1992); Ill. S. Ct. R. 236 (eff. Aug. 1, 1992). Thus, medical records are not generally admissible absent some specific exception to the hearsay rule. In a similar vein, claimant asserts that Illinois Rule of Evidence 803(4) (eff. Sept. 28, 2018) allows for the admission of his statements to his treating doctors. However, he makes no attempt to identify what portions of Exhibit 3 would fall within this exception or how their admission might have affected the proceedings below.

¶ 30    Finally, claimant contends that his off-work slips were certified by Dr. Randle such that they satisfy the requirements of section 16 of the Act (820 ILCS 305/16 (West 2012)). As set forth more fully above, this section allows for the admission of medical records that are "certified to as true and correct" by treating healthcare providers. *Id.* It is true that Randle does use the word "certify" in the off-work slips: "This is to certify that Wiley Moore has been under my professional care and was totally disabled/unable to work from 7-14-14 to 8-14-14." There is a series of slips

containing identical language except for the dates. Clearly, however, this certification concerns claimant's physical condition rather than the truth and correctness of the medical records. Section 16 requires a certification that the record is true and correct. The certification made by Randle is not the certification contemplated by section 16.

¶ 31    In light of the foregoing, these arguments are both forfeited and unpersuasive.

¶ 32                                    B. CAUSATION

¶ 33    Claimant next challenges the Commission's decision that he failed to prove that his condition of ill-being was causally related to his at-work accident of November 20, 2013. Causation presents a question of fact. *Chicago Tribune v. Industrial Comm'n*, 42 Ill. 2d 476, 478 (1969). We will not disturb such a decision unless it is against the manifest weight of the evidence. *Certi-Serve, Inc.*, 101 Ill. 2d at 244. A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Shafer*, 2011 IL App (4th) 100505WC, ¶ 35. It is well established that a claimant need only prove that employment was *a* cause of an injury; it is not necessary to prove that it is the *sole* or *principal* cause. *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 786 (2005).

¶ 34    Claimant makes several subarguments here. First, he points out that every treating physician has opined that a causal relationship existed between his accident and condition of ill-being. Moreover, one of respondent's two IMEs did as well. Indeed, only Lehman testified that no causal relationship existed. However, the number of experts supporting each side is not conclusive. *Cf. Lange v. Freund*, 367 Ill. App. 3d 641, 648 (2006) ("In light of the repeated suggestion that the number of witnesses testifying in favor of the [the plaintiffs] should decide the case in their favor, we cannot find that the trial court misled the jury or prejudiced the [plaintiffs] with its simple, accurate and argument-free statement that the number of witnesses was not to be

considered conclusive."). Moreover, the Commission offered reasons for its rejection of evidence favorable to claimant. For instance, it noted that Purvines was not aware of two relatively contemporaneous automobile accidents in which claimant was involved in 2014 as well as other trips to the hospital at this time (claimant later argues that the Commission ignored the fact that Purvines relied on an MRI from 2014; however, that fact is acknowledged in the Commission's findings of fact). Regarding Backer, it noted the provisional nature of his opinion. These were reasonable bases to discount their testimony. As such, the mere number of doctors opining favorably to claimant is of diminished significance.

¶ 35    Claimant points to the chain of events leading to his injury. Generally, a condition of relatively good health, followed by an accident, followed by a decline in health allows an inference that the accident was the cause of the decline in health. See *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59, 63-64 (1982). However, as Lehman pointed out in his deposition, it is far from clear that the state of claimant's health preceding the accident could be considered good. Claimant underwent MRIs in 2009 and 2011 that document significant degenerative changes. While claimant was able to work preceding the accident, it is unclear whether he was simply working through significant pain or if he was relatively pain free. Under such circumstances, we cannot say that the Commission was required to draw the inference advocated by claimant here or that its decision was against the manifest weight of the evidence.

¶ 36    Claimant also takes issue with the Commission's finding that he was not credible. Claimant asserts, and the dissenting commissioner agreed, that the so-called inconsistencies upon which the Commission based this assessment of his credibility were insignificant. For example, the arbitrator criticized claimant for testifying that he presented to Dr. Carr the day of the accident while Lehman's report (which was derived from Carr's records which were not admitted into the

record) stated that claimant saw Carr the day after the accident. In fact, Lehman acknowledged during his deposition that he had recorded the incorrect date in his report. This arguably had little bearing on claimant's credibility. However, the arbitrator based her decision on other, more significant issues as well. For example, she noted claimant's failure to inform Purvines of the automobile accidents and that his testimony about who recommended surgery was "very confusing." "It is well settled that it is a function of the Commission to determine whether there is a causal connection between a claimant's injuries and his employment. [Citation.] In making this determination, it is *solely* within the province of the Commission to judge the credibility of the witnesses, draw reasonable inferences from the testimony and determine the weight the evidence is to be given. [Citation.] The fact that this court or the circuit court might have drawn other inferences from the evidence is not relevant since a reviewing court will not disregard or reject permissible inferences drawn by the Commission nor will it substitute its own judgment for that of the Commission unless its findings are against the manifest weight of the evidence. [Citation.]" (Emphasis in original.) *Wagner Castings Co. v. Industrial Comm'n*, 241 Ill. App. 3d 584, 594-95 (1993).

¶ 37    Claimant also complains that the Commission ignored the fact that he had worked continually for 10 years preceding the accident, performing heavy labor the entire time. While this evidence favors claimant, attributing weight to it is a matter primarily for the trier of fact. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 206-07 (2003). Moreover, this would be pertinent to claimant's chain-of-events argument, which we address above.

¶ 38    In sum, claimant has not established that the Commission's decision on causation is against the manifest weight of the evidence, that is, that an opposite conclusion to the Commission's is

clearly apparent. In light of this finding, claimant's arguments concerning medical expenses and temporary total disability necessarily fail as well.

¶ 39                           C. OTHER EVIDENTIARY ISSUES

¶ 40    Finally, claimant contends that the Commission's decision to not admit deposition testimony of Lehman in an unrelated case is against the manifest weight of the evidence. This, however, would be a discretionary, evidentiary decision reviewed under the abuse-of-discretion standard. See *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1012 (2005). Claimant also complains of the Commission's refusal to admit a reprimand of Lehman by the State of Missouri. Neither argument is supported by citation to authority and is therefore forfeited. *Vallis Wyngroff Business Forms, Inc. v. Illinois Workers' Compensation Comm'n*, 402 Ill. App. 3d 91, 94 (2010). Moreover, nothing asserted by claimant here would lead us to conclude that these decisions were abuses of discretion—that is, that no reasonable person could agree with the Commission (*Certified Testing v. Industrial Comm'n*, 367 Ill. App. 3d 938, 947 (2006)).

¶ 41                                    IV. CONCLUSION

¶ 42    In light of the foregoing, the judgment of the circuit court of Madison County confirming the decision of the Commission is affirmed. This case is remanded for further proceedings, if any, in accordance with *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980).

¶ 43    Affirmed.